IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHWAB INDUSTRIES, INC.,　　　　　　　　CASE NO.:

　　　　　　　　Petitioner,　　　　　　　　HON.:

v.

FARADAY&FUTURE INC.

　　　　　　　　Respondent,

_____/

**THE ZALEWSKI LAW FIRM**
**By: PAUL J. ZALEWSKI (P61693)**
*Attorney for Petitioner*
29199 Ryan Road
Warren, MI 48092
(586) 573-8900
ZalewskiLegal@gmail.com

**BRIAN E. FRITZ (#3211621)**
*Attorney for Respondent*
2248 Kenilworth Ave.
Los Angeles, CA 90039-3010
(786) 877-8014
Brian.Fritz@ff.com

_____/

**PETITION/MOTION TO CONFIRM**
**CONSENT ARBITRATION AWARD**

　　　　Pursuant to 9 U.S.C. § 9, Petitioner, **SCHWAB INDUSTRIES, INC.,** by

and through its attorneys, **THE ZALEWSKI LAW FIRM**, files this

Petition/Motion to Confirm Consent Arbitration Award entered on October

30, 2019   (the "Consent Award") in connection with an arbitration between Petitioner and Respondent conducted in the State of Michigan with the American Arbitration Association.   Accordingly, Petitioner respectfully petitions this Honorable Court for confirmation of the Consent Award against Respondent and for entry of judgment in conformity with the Consent Award.  In support of this Petition/Motion to Confirm Consent Arbitration Award, Petitioner states as follows:

## PARTIES

1.      Petitioner, Schwab Industries, Inc., is a Michigan corporation with its registered office and principal place of business in the Charter Township of Shelby, County of Macomb, State of Michigan.

2.      Respondent, Faraday&Future, Inc., is a California corporation with its registered office and principal place of business at 18455 S. Figueroa Street, Gardena, California 90248.

## JURISDICTION AND VENUE

3.      Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. §1331 and 9 U.S.C. § 9 as the Consent Award was rendered in this district.

## THE ARBITRATION AND AWARD

4.      The parties to this action were involved in a commercial dispute over unpaid invoices and Petitioner commenced Arbitration in the State of Michigan with the American Arbitration Association pursuant to the terms of a certain Engineering

Services Agreement (the "Contract") with Respondent that contained a valid arbitration clause. (**Exhibit A, Contract**).

5.    On October 30, 2019, a Consent Award was issued in favor of Petitioner and against Respondent in the total amount of Two Million Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($2,031,136.15). (**Exhibit B, Consent Award**).

6.    Respondent has tendered payment of One Hundred Thousand and 00/100 ($100,000.00) towards satisfaction of the Consent Award, leaving an unpaid balance of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,931,136.15).

7.    Pursuant to the terms of the Consent Award, on or after February 14, 2020, Petitioner is entitled to "file a Petition for Confirmation of Arbitration Consent Award (the 'Petition') in the United States District Court for the Eastern District Court of Michigan, Southern Division (the 'Federal Court') pursuant to 9 U.S.C. ¶ 1 et. seq." (**Exhibit B, Consent Award**).

8.    Pursuant to the terms of the Consent Award, "Respondent will not contest, respond, protest, or object to the Petition or otherwise seek the Federal Court or AAA to stay or vacate this Consent Award for any reason whatsoever." (**Exhibit B, Consent Award**).

9.    Pursuant to the terms of the Consent Award, Petitioner "agrees that it shall

not file any liens, levies or commence any legal collections actions of any kind seeking to satisfy the balance of this Consent Award or any judgment received in the Federal Court until after March 31, 2020." (**Exhibit B, Consent Award**).

10.   Pursuant to the terms of the Consent Award, if Respondent tenders a "payment to Claimant of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then this Consent Award, and any judgment received in Federal Court after confirmation of this Consent Award, shall be deemed to be satisfied in its entirety and paid in full and that Claimant shall file notice of the Satisfaction of the Consent Award and judgment with the Federal Court." (**Exhibit B, Consent Award**).

11.   Petitioner petitions this Honorable Court to enter a money judgment in favor of Petitioner and against Respondent in accordance with the strict terms of the Consent Award. (**Exhibit B, Consent Award**).

## COUNT I – CONFIRMATION OF THE ARBITRATION AWARD

12.   Petitioner seeks to confirm the Consent Award against Respondent pursuant to terms of the Contract and 9 U.S.C. § 9.

13.   Petitioner petitions this Honorable Court to enter a judgment in favor of Petitioner and against Respondent in the amount of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars

($1,931,136.15), with the condition that Petitioner shall not file any liens, levies or commence any legal collections actions of any kind seeking to satisfy the judgment received from this Court until after March 31, 2020, and further that if Respondent pays Petitioner the amount of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then the judgment entered by this Court shall be deemed to be satisfied in its entirety and Petitioner shall file notice of the Satisfaction of the Judgment with the Court.

WHEREFORE, Petitioner respectfully requests this Honorable Court:

A. To enter an order confirming the Consent Award and enter a Judgment in favor of Petitioner, Schwab Industries, Inc., and against Respondent, Faraday&Future, Inc., in the amount of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty Six and 15/100 Dollars ($1,931,136.15), with the condition that Petitioner shall not be entitled to file any liens, levies or commence any legal collections actions of any kind seeking to satisfy the Judgment after March 31, 2020, and further that if Respondent pays Petitioner the amount of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then the Judgment shall be deemed to be satisfied and paid in its entirety and Petitioner shall

file notice of the Satisfaction of the Judgment with the Court.

B.  Grant any other relief deemed just and appropriate under the

circumstances.

Respectfully submitted;

**THE ZALEWSKI LAW FIRM**

/s/ Paul J. Zalewski
**By:  PAUL J. ZALEWSKI (P61693)**
*Attorney for Petitioner*
29199 Ryan Road
Warren, MI 48092
(586) 573-8900
ZalewskiLegal@gmail.com

Dated: February 18, 2020

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHWAB INDUSTRIES, INC.,                         CASE NO.:

                    Petitioner,                 HON.:

v.

FARADAY&FUTURE INC.

                    Respondent,

_____/

**THE ZALEWSKI LAW FIRM**
**By: PAUL J. ZALEWSKI (P61693)**
*Attorney for Petitioner*
29199 Ryan Road
Warren, MI 48092
(586) 573-8900
ZalewskiLegal@gmail.com

**BRIAN E. FRITZ (#3211621)**
*Attorney for Respondent*
2248 Kenilworth Ave.
Los Angeles, CA 90039-3010
(786) 877-8014
Brian.Fritz@ff.com

_____/

## BRIEF IN SUPPORT OF PETITION/MOTION TO CONFIRM ARBITRATION AWARD

## STATEMENT OF ISSUE PRESENTED

I.   Whether this Court should confirm the Consent Arbitration Award entered on October 30, 2019 and enter a final judgment in favor of Petitioners?

Petitioner answers:      "Yes"

Respondent answers:   "Yes"

## CONTROLLING AUTHORITY

9 U.S.C. ¶ 9 which provides:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.  If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding.  If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court.  If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

## INTRODUCTION

Petitioner, Schwab Industries, Inc., seeks confirmation of a final Consent Arbitration Award ("Consent Award") entered on October 30, 2019 (the "Award") in connection with an arbitration action between Petitioner and Respondent conducted in the State of Michigan with the American Arbitration Association.  Pursuant to the Federal Arbitration Act ("FAA") 9 U.S.C. § 1, *et. seq.*, and 9 U.S.C. § 9, as well as the terms of the parties' Consent Award, Petitioner is entitled to apply for an order with this Court confirming the Consent Award and entering judgment against Respondent and this Court must enter such judgment pursuant to the terms of the parties' agreement, as set forth in the Consent Award.

## STATEMENT OF FACTS

The parties to this action were involved in a commercial dispute over unpaid invoices and Petitioner commenced Arbitration in the State of Michigan with the American Arbitration Association pursuant to the terms of a certain Engineering Services Agreement (the "Contract") with Respondent that contained a valid arbitration clause. (**Exhibit A, Contract**).  On October 30, 2019, a Consent Award was issued in favor of Petitioner and against Respondent in the total amount of Two Million Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($2,031,136.15). (**Exhibit B, Consent Award**).  Respondent has tendered payment

4

of One Hundred Thousand and 00/100 ($100,000.00) towards satisfaction of the

Consent Award, leaving an unpaid balance of One Million Nine Hundred Thirty-

One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,931,136.15).

Pursuant to the terms of the Consent Award, on or after February 14, 2020,

Petitioner is entitled to "file a Petition for Confirmation of Arbitration Consent

Award (the 'Petition') in the United States District Court for the Eastern District

Court of Michigan, Southern Division (the 'Federal Court') pursuant to 9 U.S.C. ¶

1 et. seq." (**Exhibit B, Consent Award**).  Pursuant to the terms of the Consent

Award, "Respondent will not contest, respond, protest, or object to the Petition or

otherwise seek the Federal Court or AAA to stay or vacate this Consent Award for

any reason whatsoever." *Id.*  Pursuant to the terms of the Consent Award,

Petitioner "agrees that it shall not file any liens, levies or commence any legal

collections actions of any kind seeking to satisfy the balance of this Consent Award

or any judgment received in the Federal Court until after March 31, 2020." *Id.*

Pursuant to the terms of the Consent Award, if Respondent tenders a "payment to

Claimant of One Million Seven Hundred Eighty-One Thousand One Hundred

Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then

this Consent Award, and any judgment received in Federal Court after

confirmation of this Consent Award, shall be deemed to be satisfied in its entirety

and paid in full and that Claimant shall file notice of the Satisfaction of the Consent

Award and judgment with the Federal Court." *Id.*

Based on the above, Petitioner seeks this Honorable Court to enter a money judgment in favor of Petitioner and against Respondent in accordance with the strict terms of the Consent Award, pursuant to terms of the Contract and 9 U.S.C. § 9. Petitioner petitions this Honorable Court to enter a judgment in favor of Petitioner and against Respondent in the amount of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,931,136.15), with the condition that Petitioner shall not file any liens, levies or commence any legal collections actions of any kind seeking to satisfy the judgment received from this Court until after March 31, 2020, and further that if Respondent pays Petitioner the amount of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then the judgment entered by this Court shall be deemed to be satisfied in its entirety and Petitioner shall file notice of the Satisfaction of the Judgment with the Court.

## ARGUMENT

### I.  PETITIONER IS ENTITLED TO ENFORCEMENT OF THE CONSENT AWARD PURSUANT TO 9 U.S.C. § 9 AND THE TERMS OF THE PARTIES' AGREEMENT.

The Contract between the parties mandated arbitration in the State of Michigan with the American Arbitration Association and further provided that the

arbitration and enforcement of any award received would be governed by the FAA. (**Exhibit A, Contract**).   On October 30, 2019, a Consent Award was issued in favor of Petitioner and against Respondent in the total amount of Two Million Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($2,031,136.15). (**Exhibit B, Consent Award**).  Respondent has tendered payment of One Hundred Thousand and 00/100 ($100,000.00) towards satisfaction of the Consent Award, leaving an unpaid balance of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,931,136.15).

Under the terms of the Consent Award, Respondent has concurred to the relief sought in the present Petition/Motion to Confirm Arbitration Award and has specifically waived all its rights to vacate, modify or correct the Consent Award.   Therefore, pursuant to the FAA and 9 U.S.C. § 9, Petitioner is entitled to commence the present action to confirm the Consent Award and to have judgment entered against Respondent in accordance with the terms of the Consent Award.

Under the FAA and 9 U.S.C. § 9, the confirmation of an arbitration award through order of this Court is essentially a summary proceeding and this Court "must grant such an order unless the award is vacated, modified, or corrected." *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 587; 128 S. Ct. 1396; 170 L.Ed.2d. 254 (2008); see also *Coffee Beanery, Ltd. v. WW, L.L.C.,* 300 F.

App'x 415, 418 (6th Cir. 2008).   Respondent has stipulated to the terms of the Consent Award and has agreed that it "will not contest, respond, protest, or object" to this Petition/Motion to Confirm Arbitration Award or otherwise seek "to stay or vacate this Consent Award for any reason whatsoever." (**Exhibit B, Consent Award**).   Therefore, this Honorable Court must enter judgment in favor of Petitioner and against Respondent in accordance with the terms of the Consent Award

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that this Honorable Court enter a judgment in favor of Petitioner and against Respondent in the amount of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,931,136.15), with the condition that Petitioner shall not file any liens, levies or commence any legal collections actions of any kind seeking to satisfy the judgment received from this Court until after March 31, 2020, and further that if Respondent pays Petitioner the amount of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then the judgment entered by this Court shall be deemed to be satisfied in its entirety and Petitioner shall file notice of the Satisfaction of the Judgment with the Court.

WHEREFORE, Petitioner respectfully requests this Honorable Court:

A. To enter an order confirming the Consent Award and enter a Judgment in favor of Petitioner, Schwab Industries, Inc., and against Respondent, Faraday&Future, Inc., in the amount of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty Six and 15/100 Dollars ($1,931,136.15), with the condition that Petitioner shall not be entitled to file any liens, levies or commence any legal collections actions of any kind seeking to satisfy the Judgment after March 31, 2020, and further that if Respondent pays Petitioner the amount of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then the Judgment shall be deemed to be satisfied and paid in its entirety and Petitioner shall file notice of the Satisfaction of the Judgment with the Court.

B. Grant any other relief deemed just and appropriate under the circumstances.

Respectfully submitted;

**THE ZALEWSKI LAW FIRM**

/s/ Paul J. Zalewski
**By:  PAUL J. ZALEWSKI (P61693)**
*Attorney for Petitioner*
29199 Ryan Road
Warren, MI 48092
(586) 573-8900
Dated: February 18, 2020          ZalewskiLegal@gmail.com

9

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHWAB INDUSTRIES, INC.,                    CASE NO.:

                    Petitioner,              HON.:

v.

FARADAY&FUTURE INC.

                    Respondent,

_____/

**THE ZALEWSKI LAW FIRM**
**By:  PAUL J. ZALEWSKI (P61693)**
*Attorney for Petitioner*
29199 Ryan Road
Warren, MI 48092
(586) 573-8900
ZalewskiLegal@gmail.com

**BRIAN E. FRITZ (#3211621)**
*Attorney for Respondent*
2248 Kenilworth Ave.
Los Angeles, CA 90039-3010
(786) 877-8014
Brian.Fritz@ff.com

_____/

# **EXHIBIT A**



FARADAY FUTURE
ENGINEERING SERVICES AGREEMENT

No. [SOW document number]
Version 1.0

This Engineering Services Agreement (the "Agreement") is made and entered into as of this April 1, 2018 ("Effective Date") by and between Faraday&Future Inc., a California corporation located at 18455 S. Figueroa St., Gardena, CA 90248 ("Company"), and Schwab Industries, Inc., a Michigan corporation located at the address set forth on the signature page hereto (the "Developer") (collectively, the "Parties" and individually, "Party").

WHEREAS, Company is in the business of designing and developing luxury electric vehicles for intended manufacture.

WHEREAS, Developer is in the business of designing, manufacturing and selling metal stampings and assemblies (the "Product").

WHEREAS, Company wishes to engage Developer, and Developer wishes to undertake such activities to design, manufacture and supply the Products as more fully set forth herein.

NOW, THEREFORE, based on the foregoing facts and in consideration of the mutual covenants and conditions contained in this Agreement, Company and Developer hereby agree as follows:

1.  DEFINITIONS. For purposes of this Agreement and any Statement of Work ("SOW"), the following definitions shall apply to the terms set forth or referred to in this Section 1; the definitions of terms in the singular herein shall apply to such words when used in the plural where the context so permits and vice versa; any use of "and" herein shall be deemed to mean "and/or":

    1.1.  "Affiliates" means any business entity that one Party controls, is controlled by, or is under common control with such Party.

    1.2.  "Background Intellectual Property Rights" means Company's Intellectual Property or Developer's Intellectual Property, as applicable, except for any Foreground Intellectual Property Rights.

    1.3.  "Claim" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or other, whether at law, in equity or otherwise;

    1.4.  "Confidential Information" has the meaning set forth in Section 5.1.

    1.5.  "Contract" has the meaning set forth in Section 2.1.

    1.6.  "Correct Invoice" is an invoice which (a) references a valid Company Purchase Order("PO"), (b) conforms 100% to the deliverables and specifications specified in the SOW, (c) the deliverables invoiced have been performed by Developer to Company's satisfaction and acceptance, and (d) contains such additional information required by the relevant SOW and/or PO.

    1.7.  "Deliverables" means any information, material or item that is: (i) specifically listed as a deliverable in the applicable Statement of Work or PO; or (ii) produced by or on behalf of Developer in connection with Developer's performance under the Contract.

    1.8.  "Developer Parties" means Developer, its Affiliates, customers (other than Company), subcontractors and successors and assigns, and each of their respective Representatives.

    1.9.  "Developer's Intellectual Property" means all Intellectual Property Rights owned by or licensed to Developer by a non-Party to this Agreement, including any of Developer's Background Intellectual Property Rights used in the design, production and manufacturing of the Products.

    1.10.  "Dispute" has the meaning set forth in Section 10.

    1.11.  "Effective Date" means the date first set forth above.

    1.12.  "Company Parties" means Company, its Affiliates, customers, subcontractors and successors and assigns, and each of their respective Representatives.

    1.13.  "Company's Intellectual Property" means all Intellectual Property Rights owned by or licensed to Company, including all Foreground Intellectual Property Rights and any of Company's Background Intellectual Property Rights used in the design, production and manufacturing of the Products.

    1.14.  "Force Majeure Event" has the meaning set forth in Section 11.3.

    1.15.  "Foreground Intellectual Property Rights" means any and all of the Intellectual Property Rights developed with respect to, or for incorporation into, the Products, that are either developed by Company alone, by Company and Developer jointly or by Developer alone in connection with this Agreement.

    1.16.  "Indemnified Parties" has the meaning set forth in Section 9.1.

    1.17.  "Indemnifying Party" means Developer.

    1.18.  "Intellectual Property Rights" means any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), mask works, patents, and other intellectual property rights therein and other similar designations arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof.

    1.19.  "Law" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, order, writ, judgment, injunction, decree, stipulation, award, determination or other requirement or rule of law of any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or an arbitrator, court or tribunal of competent jurisdiction.

    1.20.  "Losses" has the meaning set forth in Section 9.1.

    1.21.  "Personnel" of a Party means any agents, employees, contractors or Subcontractors engaged or appointed by such Party.

    1.22.  "Price" has the meaning set forth in Section 3.2.

    1.23.  "Product" has the meaning set forth in the preamble of this Agreement and further described in the Specifications attached to the SOW or PO.

    1.24.  "Product Development" has the meaning set forth in Section 2.1.

    1.25.  "Products Supply" has the meaning set forth in Section 3.1.

    1.26.  "Purchase Order" or "PO" means Company's purchase order issued to Developer hereunder, which may, among other things, specify items such as: (a) the Products to be purchased; (b) the quantity of each of the Products ordered; (c) the delivery date; (d) the unit Price for each of the Products to be purchased; (e) the billing address; and (f) the delivery location. The terms of this Agreement shall be incorporated into each and every PO, any amended PO, and any release issued by Company to Developer.

    1.27.  "Representatives" means a Party's Affiliates and each of their respective Personnel, officers, directors, partners, shareholders, attorneys, third-party advisors, successors and permitted assigns.

    1.28.  "Services" means all of the services, materials and Deliverables which shall be provided by the Developer under the Contract.

© 2018 Faraday Future Inc. All rights reserved. This document contains the confi... ...r Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future pr... ...ment are Uncontrolled.



EXHIBIT
A



FARADAY FUTURE
ENGINEERING SERVICES AGREEMENT

No. [SOW document number]
Version 1.0

1.29. "Specifications" means the specifications for the Product provided by Company to Developer.

1.30. "Statement of Work" or "SOW" has the meaning set forth in Section 2.1.

1.31. "Subcontractors" has the meaning set forth in Section 4.3.

1.32. "Term" has the meaning set forth in Section 8.1.

1.33. "UCC" means the Uniform Commercial Code, as adopted in the State of Michigan.

2. PRODUCT DEVELOPMENT

2.1. Product Development. During the Term, Developer shall perform the Services and Deliverables for the development of the Product ("Product Development") in compliance with the requirements set forth in the Contract. The "Contract" for the Product Development of Product shall only include this Agreement, the fully executed SOW, appendices and exhibits attached to the SOW, any corresponding PO issued by Company, and any approved amendments to the SOW or PO. Developer is not authorized to begin performing Services or Deliverables until a PO has been issued. A subsequent agreement between the parties containing terms and conditions for production of the Product will be executed prior to the expiration of the Term of this Agreement.

2.2. Changes in Scope. Company may at any time notify Developer of a change request to make changes to the scope, definition, or schedule of deliverables for the Product Development. Upon receipt, Developer shall evaluate each change request as soon as possible and provide a written estimate (with sufficient supporting information) of any required increase or decrease in the cost of or time required for the performance of the Product Development.

2.3. Acceptance Period. Company shall have thirty (30) days (the "Acceptance Period") to determine the acceptability of any deliverable. Within thirty (30) business days following the end of the Acceptance Period, Company shall (a) provide written notice of acceptance to Developer, or (b) provide written notice of non-acceptance with reasonable written comments to Developer regarding the deficiencies of the deliverable(s). If changes are required by Company, Developer shall have thirty (30) days to correct the deficiency noted therein and resubmit the deliverable to Company beginning a new Acceptance Period. This process shall continue until Developer has corrected all deficiencies and Company accepts the deliverable.

2.4. Delays Caused By Company. Developer shall not be liable for any alleged delays in performance under this Agreement, any Contract Documents, SOWs or POs, if such delays are caused by the Company due to Product changes, Product Specification changes, SOW changes, scope of work changes, Company's failure to issue a proper PO or delays in supplying any raw materials that are to be provided to Developer by the Company. In the event of any delays in performance of Product Development that are caused by the Company, Developer shall have the right to cease performance under this Agreement, any Contract Documents, SOWs or POs until Company cures the event causing such delays.

2.5. Agreement to Govern. If there is any conflict, contradiction, inconsistency or incompatibility between the terms and conditions of any Contract documents, SOWs, or POs, then this Agreement shall exclusively govern.

3. INDEPENDENT CONTRACTOR STATUS; SUBCONTRACTORS:

3.1. Independent Contractor Status. It is understood and acknowledged that the Product Development which Developer will provide to Company hereunder shall be in the capacity of an independent contractor and not as an employee or agent of Company. Developer shall control the

methods, operations, funds, conditions, time, details, and means by which Developer performs the Product Development. Company shall have the right to inspect the work of Developer as it progresses solely for the purpose of determining whether the work is completed according to the applicable SOW and/or PO. Developer has no authority to commit, act for or on behalf of Company, or to bind Company to any obligation or liability.

3.2. Developer's Personnel. Developer shall be solely responsible for the employment, control, and conduct of all Developer's Personnel, and Developer shall be solely responsible for making all withholdings and payments of all payroll taxes and similar obligations, including income taxes, FICA, social security taxes, federal and state unemployment insurance contributions, state disability premiums, workers compensation, and/or any similar taxes and fees relating to the Product Development, for each of Developer's Personnel authorized to perform hereunder. As such, Developer's Personnel are not entitled to any employment rights or benefits from Company or its Affiliates and shall in no way be deemed and/or construed to be employees of Company or its Affiliates. Neither Company nor its Affiliates shall have no power to hire, discipline or fire Developer's Personnel or to supervise or control the work schedules or conditions of employment, except as otherwise set forth herein.

3.2.1. On-Site Restriction. Developer shall not be permitted and hereby promises that it shall not permit any Developer's Personnel that are not recognized as W2 employees by Developer to work on-site at any facilities, buildings, or premises owned or leased by Company or its Affiliates.

3.3. Third Party Subcontractors. Developer shall be permitted to subcontract performance of work or processes called for under the SOW or any PO to a third party ("Subcontractor") without the prior consent of Company. Any subcontractor assignment does not relieve Developer of its own individual duties or obligations under the SOW or PO. Developer shall be solely responsible for any costs and expenses incurred by Subcontractors. However, if Company directs or otherwise requires Developer to subcontract all or a portion of its duties or obligations under the SOW or PO to any subcontractor, then Developer shall not be responsible for a breach of any Contract documents, SOW or PO caused by that subcontractor's failure to meet its warranty, delivery, or other contractual obligations.

4. CONFIDENTIAL INFORMATION:

4.1. Confidential Information. "Confidential Information" means all non-public, confidential or proprietary information and materials of Company Parties furnished by or on behalf of any of the Company Parties to Developer and/or Developer's Representatives, including but not limited to all drafts, copies, summaries, and extracts of any of the foregoing, and/or otherwise arising from and/or in connection with this Agreement, whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked as such, including trade secrets. Confidential Information shall not include any information that: (a) is or becomes generally available to the public other than as a result of Developer's breach of this Agreement (except for personally identifiable information which shall remain Confidential Information); (b) is obtained by Developer on a non-confidential basis from a third-party that was not legally or contractually restricted from disclosing such information; or (c) Developer establishes by documentary evidence, was lawfully in Developer's possession prior to the date of disclosure hereunder. It is further contemplated that the terms and

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.


existence of this Agreement shall be treated as Confidential Information.

4.2. Restricted Use. All Confidential Information is and shall remain the property of Company or the Company Parties at all times. Developer shall use such Confidential Information only for the purpose, and to the extent necessary, of fulfilling its obligations under this Agreement and any applicable SOW or PO. Upon Company's request or the termination of the business relationship between the parties, whichever is earlier, Developer shall promptly return all documents and other materials containing Confidential Information.

4.3. Nondisclosure. Developer agrees and acknowledges on behalf of Developer and Developer's Representatives that they shall have no proprietary interest in the Confidential Information and shall not disclose, communicate nor publish the nature or content of such Confidential Information to any person or entity, nor use, except as authorized in writing by Company, any of the Confidential Information it (or any of the Developer's Representatives) produces, receives, acquires or obtains from any of the Company Parties and/or as a result of or arising from this Agreement. The Developer shall take (and cause the Developer's Representatives to take) all necessary steps to ensure that the Confidential Information is securely maintained, including by causing all Developer's Representatives to sign a non-disclosure agreement regarding the Confidential Information herein with no less restrictive terms than the ones contained in this Section 5.3 before the permissible disclosure of any such Confidential Information. In the event the Developer (or any of the Developer's Representatives) becomes legally compelled to disclose any of the Confidential Information, Developer shall provide Company with prompt notice thereof and shall not divulge any information until Company has had the opportunity to seek a protective order or other appropriate remedy to curtail such disclosure. If such actions by Company are unsuccessful, or Company otherwise waives its or the Company Parties' right to seek such remedies, the relevant Developer's Representatives shall disclose only that portion of the Confidential Information which it is legally required to disclose.

4.4. Remedies. Developer agrees that any breach or threatened breach of this Section 5 could cause not only financial harm, but also irreparable harm, to Company, and that money damages will not provide an adequate remedy. As such, in addition to any other rights or remedies provided hereunder or by Applicable Law, Company shall be entitled to injunctive relief for any threatened or actual breach of this Section 5, without proof of damages or the need to post security. Pursuit of any remedy at law or in equity shall not be deemed as an election of remedies.

5. INTELLECTUAL PROPERTY:

5.1. Ownership. Each of the Parties acknowledges and agrees that:

5.1.1. each Party retains exclusive ownership of its Background Intellectual Property Rights;

5.1.2. Company does not transfer to Developer any of its Background Intellectual Property Rights, and Developer may not use any of Company's Background Intellectual Property Rights other than to develop, produce and supply Products to Company hereunder;

5.1.3. Developer does not transfer to Company any of Developer's Background Intellectual Property Rights, except that Developer grants to Company and its Affiliates the right to resell Products or incorporate Products purchased from Developer into finished

goods and to sell such finished goods to Company and its Affiliates, and each of their customers;

5.1.4. all Foreground Intellectual Property Rights will be owned by Company;

5.1.5. Developer hereby irrevocably assigns to Company all of Developer's right, title and interest in and to all Foreground Intellectual Property Rights, and, to the extent that any Foreground Intellectual Property Rights are copyrightable works or works of authorship (including computer programs, technical specifications, documentation and manuals), the Parties agree that such works are "works made for hire" for Company under the US Copyright Act; and

5.1.6. Developer shall only use the Foreground Intellectual Property Rights to produce and supply Products to Company and its Affiliates.

5.2. Prohibited Acts. Each of the Parties shall not:

5.2.1. take any action that may interfere with the other Party's Intellectual Property Rights, including such other Party's ownership or exercise thereof;

5.2.2. challenge any right, title or interest of the other Party in such other Party's Intellectual Property Rights;

5.2.3. make any Claim or take any action adverse to such other Party's ownership of its Intellectual Property Rights;

5.2.4. register or apply for registrations, anywhere in the world, the other Party's trademarks or any other trademark that is similar to such other Party's trademarks or that incorporates such trademarks in whole or in confusingly similar part;

5.2.5. use any mark, anywhere, that is confusingly similar to the other Party's trademarks;

5.2.6. misappropriate any of the other Party's trademarks for use as a domain name without such other Party's prior written consent; or

5.2.7. alter, obscure or remove any of the other Party's trademarks or trademark or copyright notices or any other proprietary rights notices placed on the products purchased under this Agreement (including Products), marketing materials or other materials.

5.3. License of Developer's Background Intellectual Property Rights. Developer grants to Company and its Affiliates an irrevocable, non-exclusive, worldwide, perpetual, royalty-free license, with the right to grant sublicenses, to use Developer's Background Intellectual Property Rights to produce, procure use, sell and to obtain, from alternate sources, products and services similar to the Products (including related systems and components) following the expiration or earlier termination of this Agreement and in connection with Company's rights hereunder to purchase Products from an alternative source at any time during the Term hereof.

5.4. Developer's Representatives. Developer shall ensure that all Developer's Representatives performing or engaged under this Agreement are informed of Company's rights and obligations under this Agreement and Developer shall provide any legal notices required by applicable Law necessary to ensure that any Intellectual Property Rights prepared by or on behalf of any such Developer's Representatives are the property of Company as contemplated by this Agreement. Developer shall, as necessary, obtain the assignment and conveyance to Company, or to Developer for the benefit of Company, of any patent or other proprietary rights that such persons or entities may then have or may have in the future to such Intellectual Property Rights.

5.5. License to Third Party Content. Developer shall advise Company in advance and in writing when Developer (or any Developer's Representatives) intends to include any third-

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

No. [SOW document number]
Version 1.0

party content into any of the Products, and such third-party content shall not be included in any Products without the prior written approval of Company.  To the extent third party content of any kind is embodied in any Products, Developer hereby grants, or shall cause such third party to grant, Company and its Affiliates a non-exclusive, worldwide, perpetual, irrevocable fully paid up license to use such third party content to the extent Company (or its Affiliates) determines it needs or desires to use such third-party rights to obtain the benefit of the Products Development and/or to use, maintain, modify, enhance, perform, distribute, combine with others, copy and/or create derivative works of the Products.

5.6.   Trademarks.  Developer shall not have any right to use the names, logos, symbols and/or any other trademarks of Company or its Affiliates unless and until each such use is approved in advance and in writing by Company.  Developer shall not directly or indirectly obtain or attempt to obtain during the Term or at any time thereafter, any right, title or interest in or to said marks.  All uses inure to the benefit of Company or its Affiliates.  Developer's permission to use the marks may be withdrawn by Company at any time at its discretion upon written notice to Developer by Company, and, upon delivery of such notice, Developer shall immediately discontinue use of the marks.  Any press release or announcement or identification by Developer of its relationship with Company in connection with this Agreement and/or the subject matter thereof must be pre-approved in writing by Company in each instance.

6.   PAYMENTS; INVOICES; EXPENSES.

6.1.   Payment Terms.  Payment terms shall be net thirty (30) days from the date that any Correct Invoice is submitted to Company by Developer for any work, Deliverables, Products, Product Development, or Services provided to Company.  If Company fails to pay Developer according to these agreed upon payment terms, then Developer shall be excused and relieved from all further performance under any existing SOW or PO, Developer may terminate this Agreement with cause (as set forth in Section 7.4) and further, Developer shall have the right to demand full payment in advance for any future work, Deliverables, Products, Product Development, or Services that Developer agrees to provide to Company under any existing or new PO.

6.2.   Expenses.  Unless otherwise specifically set forth in this Agreement, the SOW or associated POs, Developer shall bear all of its own expenses arising from the performance of its obligations under this Agreement.  If, pursuant to the relevant SOW or PO, Company is to reimburse certain expenses of Developer, such expenses must be pre-approved in writing by Company prior to submission of a Correct Invoice and accompanied by receipts and supporting documentation acceptable to Company.  All Developer expenses not pre-approved by Company or not otherwise meeting the requirements of this Agreement, the SOW or PO shall be the Developers' sole responsibility.

7.   TERM; TERMINATION.

7.1.   Term.  This Agreement shall commence as of the Effective Date and shall continue until the later of the expiration or termination of the last SOW or on March 31, 2019 ("Term"), unless sooner terminated as set forth in this Section 7 or otherwise set forth herein.

7.2.   Termination Without Cause.  By providing at least thirty (30) days prior written notice to the other Party, both Company and Developer, in its/their sole discretion, may terminate this Agreement or any SOW or PO, in whole or in part, at any time without cause, and without liability except for Company's required payment of any work, Deliverables, Products, Product Development, or Services provided to

Company under any existing or new PO that has been actually rendered, and reimbursement for authorized expenses actually incurred and approved, prior to the termination date.  Upon notice of termination, Developer shall (i) terminate all or the specified portion of the work under the SOW and PO; (ii) transfer title to and deliver to Company or its designee, the usable and merchantable Products, work in process and raw materials/components that Developer has produced and/or purchased based upon the Releases issued by Company; (iii) upon request, cooperate with Company in effectuating the re-source of the goods and services to an alternate supplier specified by Company.

7.3.   Payment to Developer.  Upon termination under this Section 7, within thirty (30) days after receiving notice of termination, Company shall pay to Developer the following documented amounts without duplication: (i) the PO purchase price for all finished and completed Products for which payment has not been previously made and which were produced in accordance with the SOW, any PO; (ii) Developer's reasonable and actual cost of the usable and merchantable work in process; (iii) Developer's reasonable direct and actual costs incurred in settling claims of its subcontractors that are rendered unrecoverable by the termination; and (iv) Developer's reasonable and actual costs in storing and protecting Company's property.

7.4.   Termination With Cause.  Either Party may terminate this Agreement, effective upon written notice to the other Party (the "Defaulting Party"), if the Defaulting Party:

7.4.1.   Breaches this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Defaulting Party does not cure such breach within fifteen (15) days after receipt of written notice of such breach;

7.4.2.   Commits any act or becomes involved in any situation or occurrence which brings Company or Developer, or any Company Parties or Developer Parties, into public disrepute or contempt, or which damages or disparages the goodwill or reputation of Company or Developer, or Company Parties or Developer Parties, or which reflects unfavorably upon Company or Developer, or Company Parties or Developer Parties, as reasonably determined by Company or Developer in its/their discretion, and Company or Developer fails to cure the situation within fifteen (15) days of such situation or occurrence to Company's or Developer's respective satisfaction;

7.4.3.   Breaches the intellectual property, confidentiality, or other provisions of this Agreement.

7.4.4.   Becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) business days or is not dismissed or vacated within forty-five (45) days after filing;

7.5.   Effect of Expiration or Termination.

7.5.1.   Immediately upon the effectiveness of a notice of termination, Developer shall, unless otherwise directed by Company:

7.5.1.1.   promptly terminate all performance under this Agreement and under any outstanding SOW or PO;

7.5.1.2.   transfer title to and deliver to Company all Products (including equipment and tooling) that has been fully paid for by Company;

7.5.1.3.   return to Company or dispose (in accordance with Company's instructions and reimbursement of Developer's actual, reasonable costs associated with such

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



FARADAY FUTURE
ENGINEERING SERVICES AGREEMENT

No. [SOW document number]
Version 1.0

disposal upon proof of costs) any property furnished by or belonging to Company or its Affiliates, so long as Company has fully paid Developer in accordance with the terms of this Agreement and/or any PO;

7.5.1.4.   Developer shall devote its best good faith efforts prior to the effective termination date or expiration date to cooperate with Company to minimize the interruption of the Products Development or Products Supply caused by termination or expiration and the appointment of another supplier. During this period, Developer also agrees to give Company all reasonable and prompt cooperation toward transferring, with approval of third parties in interest, all contracts and other arrangements with third parties or others, upon being duly released from the obligation thereof;

7.5.2.   Expiration or termination of the Term will not affect any rights or obligations of the Parties that come into effect upon or after termination or expiration of this Agreement; or

7.5.3.   Upon the expiration or earlier termination of this Agreement, each Party shall:

7.5.3.1.   Return to the other Party or destroy all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information;

7.5.3.2.   Permanently erase all of the other Party's Confidential Information from its computer systems, except for copies that are maintained in accordance with the Party's internal recordkeeping policies;

7.5.3.3.   On a pro rata basis, repay all fees and expenses paid in advance for any Product Development work that was not completed as of the date of termination; and

7.5.3.4.   Certify in writing to Company that it has complied with the requirements of this Section 7.5.

7.5.4.   Neither Party will be liable to the other Party for any damage of any kind incurred by the other Party by reason of the expiration or earlier termination of this Agreement. Termination of this Agreement will not constitute a waiver of either Party's rights, remedies or defenses under this Agreement, at Law, in equity or otherwise.

7.6.   Survival. Notwithstanding any other terms hereof, the rights and obligations of the parties set forth in Sections 3, 4, 6, 7, 8, 9, 10, and 11, and any other terms under a SOW or PO indicated as surviving, and any right or obligation of the Parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, will survive any such termination or expiration of this Agreement.

8.   LIMITED INDEMNIFICATION, REPRESENTATIONS AND WARRANTIES:

8.1   Limited Indemnification. Subject to the terms and conditions of this Agreement, Indemnifying Party shall indemnify, defend and hold harmless the Company Parties and each of their Representatives, officers, directors, employees, agents, contractors, Affiliates, successors and permitted assigns (collectively, "Indemnified Parties") against any and all Claims, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers, incurred by

any Indemnified Party (collectively, "Losses"), relating to, arising out or resulting from any third-party Claim or any direct Claim against Indemnifying Party alleging material defects in the particular Product produced by Developer if such Claims arise from allegations that the Product was not produced pursuant to the particular Specifications and tolerances provided by the Company.

8.2   Representations and Warranties. Developer (on behalf of itself and its Representatives) represents, warrants and covenants that:

8.2.1   it shall perform the Product Development in a competent and workmanlike manner in accordance with the level of professional care customarily observed by highly skilled professionals rendering similar services as provided hereunder;

8.2.2   all Products, tooling, and other goods provided hereunder shall a) comply with all performance standards and product characteristics, including without limitation Specifications, drawings, descriptions or samples, furnished and/or specified by Company, (b) be merchantable, (c) be free from defects in material and workmanship, and (d) to the extent that Developer designs any goods, or Company relies on Developer's expertise in any aspect of the design of the goods communicated by Developer to Company, those goods will be fit and sufficient for the purposes intended;

8.2.3   it shall use reasonable efforts to ensure that its Representatives comply with all Laws;

8.2.4   it shall use reasonable efforts to notify Company if Developer learns that any of the Deliverables do not comply with any applicable Laws relating to the Deliverables;

8.2.5   Developer is the lawful owner or licensee of all programs and/or Developer's Intellectual Property used by it in the Products and that such Products and Intellectual Property Rights have been lawfully developed or acquired by Developer and Developer has the right to permit Company and its Affiliates to access or use such;

8.2.6   Developer has all right, power and authority (a) to grant Company good and marketable title to the Products and tooling, free from any third party interests, liens or encumbrances, except those created by Developer due to any breach of the Company's obligations under this Agreement or any PO, including but not limited to Company's payment obligations to Developer, and (b) to grant the license to the Developer's Background Intellectual Property to Company and its Affiliates as more fully described above, without need for any further consent of any third party, and exercisable without any interference;

8.2.7   Developer has no other agreement or relationship or commitment that conflicts with Developer's obligations to Company under this Agreement, including, but not limited to, any agreement to assign inventions, trademarks, copyrights, ideas or other Intellectual Property Rights.

9.   MEDIATION; ARBITRATION:

9.1   The laws of the State of Michigan shall apply to all disputes between the Parties, including but not limited to the application, construction, effect, enforcement, interpretation of this Agreement, the SOW, any applicable POs and all other Contract documents and contractual relations between the Parties of any kind whatsoever. The Parties further agree to submit all controversies or claims arising out of their contractual business relationship, this Agreement, the SOW, any applicable POs, any Contract documents or any other dispute of any kind to binding arbitration administered by the American Arbitration Association (AAA) at a location to be

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



determined in Macomb County, Michigan, including, but not limited to, any and all issues that arise from: (i) any document, agreement or procedure related to or delivered in connection with this Agreement, the SOW, or any PO; (ii) any protocol, dispute, claim, controversy or issue that touches, concerns, is related to or is delivered in connection with this Agreement, the SOW, or any PO, in any way, shape or form, regardless of substance or procedure; (iii) the alleged breach of this Agreement, the SOW, or any PO, and/or; (iv) any claims for damages resulting from any business conducted between the Parties related to this Agreement, the SOW, or any PO, including claims of injury to persons, property or business interests (torts). The arbitration proceedings shall be conducted under the then currently published Commercial Arbitration Rules for AAA and shall be decided by a single AAA arbitrator. The AAA arbitrator shall have the authority to resolve any dispute as to whether an issue is arbitrable.

9.2   The decision of the arbitrator shall be in writing and shall be final and binding upon both Parties. Any award may be enforced by either Party, as applicable, in a court of competent jurisdiction in the State of Michigan. Each Party shall bear its own cost of preparing and presenting its case, including the fees of the arbitrator; provided, however, the parties agree that the prevailing Party in such arbitration shall be awarded its arbitrator costs, arbitration administration, and other AAA related fees incurred in connection with the Arbitration. The arbitrator is not empowered to award damages in excess of those permitted under this Agreement or the applicable SOW and attorneys' fees and legal costs and expenses. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1 et seq., to the exclusion of state laws inconsistent therewith and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. All negotiations and proceedings pursuant to this Section 10 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and any additional confidentiality protections provided by applicable law.

9.3   Nothing herein shall serve as a waiver by any Party to claim injunctive relief where applicable under this Agreement.

10.   MISCELLANEOUS:

10.1.   Export Control. Developer acknowledges that any technical information, know-how, drawings, designs, specifications, models, software, hardware or other technical data provided by Company may be subject to the United States export control laws and regulations including the Export Administration Regulations (EAR) administered by Department of Commerce, Bureau of Industry and Security and the Foreign Asset Control Regulations administered by the Department of Treasury, Office of Foreign Assets Control (OFAC). Where applicable, Developer agrees to comply with all applicable export control and sanctions laws and regulations of the U.S. and any other relevant country (if any) including, but is not limited to, abiding by U.S. sanctions, embargoes and prohibitions on transactions with restricted parties and countries. This includes the prohibition on the export, reexport or transfer of commodities, materials, software and technology subject to this Agreement for end-uses such as missile technology, sensitive nuclear, or chemical biological weapons end uses. Where applicable, Developer agrees to notify Company if Deliverables to be provided to Company under this Agreement are subject to the U.S. Department of State, International Traffic in Arms Regulations (ITAR) or the Wassenaar Munitions List prior to the delivery of the Deliverables. Developer will send notifications to Company's Export Compliance Department via e-mail to exportcontrol@faradayfuture.com.

10.2.   Insurance. During the Term and for a period of five (5) years thereafter, Developer shall, at its own expense, maintain and carry in full force and effect, with financially sound and reputable insurers, the following types of insurance coverage: (a) commercial general liability insurance (including premises operations, product liability, and products and completed operations) for a sum no less than Five Million ($5,000,000.00) Dollars; (b) professional liability/errors and omissions insurance (with no exclusion for engineering exposure) for a sum no less than One Million ($1,000,000.00) Dollars; (c) worldwide intellectual property insurance for at least the value of Developer's Background IP; (d) automobile liability insurance on all owned, non-owned, and hired vehicles for a sum no less than One Million ($1,000,000.00) Dollars and physical damage insurance for the actual cash value of each such vehicle, (e) employer's liability insurance for a sum no less than One Million ($1,000,000.00) Dollars; and (f) employee dishonesty/theft insurance for a sum no less than Five Hundred Thousand ($500,000.00) Dollars. Immediately upon the signing of this Agreement, Developer shall provide Company with a certificate of insurance evidencing the insurance coverage specified in this Section 10.2. The certificate of insurance shall name Company as an additional insured and loss payee. Developer shall provide Company with ten (10) days' advance written notice in the event of a cancellation or material change in such insurance policy. Developer waives and Developer shall cause its insurers to waive, any right of subrogation or other recovery against Company, its Affiliates, and their insurers.

10.3.   Force Majeure. Any delay or failure of either Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's reasonable control, without such Party's fault or negligence, and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include, without limitation, natural disasters, embargoes, explosions, riots, weather, strikes, lockouts, wars, trade restrictions, or acts of terrorism) (each, a "Force Majeure Event"). Company's or Developer's financial inability to perform, changes in cost or availability of materials, components or services; market conditions, or Subcontractor's actions or contract disputes shall not be included in the definition of Force Majeure Event. Company and Developer shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. Both Company and Developer shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement.

10.4.   Severability. If any term or provision of this Agreement is found to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, this Agreement may be modified to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

10.5.   Entire Agreement/Modification. No oral agreements, promises, representations, statements or conversations between the Parties hereto or their Representatives, whether the same shall have been express or implied, occurring either before or after the execution of this Agreement, shall

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

No. [SOW document number]
Version 1.0

be construed as having any bearing or affect upon this Agreement or any portion hereof, it being understood that this Agreement (including any applicable Exhibits, SOWs and POs) constitutes the entire agreement between Company and Developer relating to the transactions contemplated hereby. The Parties agree that this Agreement shall supersede all prior offers, contracts, agreements and arrangements between the Parties. This Agreement may not be modified or extended except by a written agreement signed by an authorized representative of each Party.

10.6.   Form Documents Do Not Supersede Agreement. The Parties may use standard business forms or other communications, but use of such forms is for convenience only and does not alter the provisions of this Agreement. Neither Party shall be bound by, and each specifically objects to, any provision that is different from or in addition to this Agreement or any applicable Exhibits and/or SOWs and POs (whether proffered verbally or in any quotation, invoice, shipping document, acceptance, confirmation, correspondence, or otherwise), unless such provision is specifically agreed to in a writing and signed by both Parties and indicates an intent to supersede the terms hereof. Any terms and conditions set forth, incorporated or adopted by reference into the SOW or any PO between the parties that alter, conflict or modify the terms and conditions set forth in this Agreement shall not be binding on any Party and shall have no force and effect whatsoever, unless agreed to a writing and signed by both Parties and indicates an intent to supersede the terms hereof.

10.7.   Waiver. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

10.8.   Assignment. Developer shall not assign, transfer, delegate, or subcontract any of its rights or obligations under this Agreement without the prior written consent of Company. Any purported assignment or delegation in violation of this Section 11.10 shall be null and void. No assignment or delegation shall relieve the Developer of any of its obligations hereunder. Company may at any time assign or transfer any or all of its rights or obligations under this Agreement without Developer's prior written consent.

10.9.   Successors and Assigns. This Agreement is binding on and inures to the benefit of the Parties and their respective successors and permitted assigns.

10.10.  No Third-Party Beneficiaries. This Agreement benefits solely the Parties and their respective successors and permitted assigns and nothing in this Agreement, express or implied, confers on any third party any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

10.11.  Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in this Agreement, a signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

10.12.  Headings. The headings of the various clauses in this Agreement have been inserted for the convenience of the Parties only. They shall not be used to interpret or construe the meaning of the terms and provisions hereof.

10.13.  Authority; Binding Effect. The Parties expressly declare and represent that they are represented by legal counsel, that together with their legal counsel they have read this entire Agreement, and that they fully understand the content and effect of the contractual covenants, promises and obligations set forth herein, and that they approve and accept the terms and conditions contained herein. This Agreement shall be construed and interpreted as though jointly drafted by both Parties. The Parties' designated Representatives whose signatures appear below are authorized to sign and bind the respective Parties for all legal purposes to the Agreement.

FARADAY&FUTURE INC.

By:      _____

Print Name:  _____

Title:    _____

Date:    _____

FARADAY&FUTURE INC.

By:      _____

Print Name:  _____

Title:    _____

Date:    _____

SCHWAB INDUSTRIES, INC.

By:      _____

Print Name:  _____

Title:    _____

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.

 FARADAY FUTURE
ENGINEERING SERVICES AGREEMENT

No. [SOW document number]
Version 1.0

Address _____ 50450 Rizzo Dr Shelby twp MI 48315 _____

Date: _____ 6-24-18 _____

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHWAB INDUSTRIES, INC.,                    CASE NO.:

               Petitioner,          HON.:

v.

FARADAY&FUTURE INC.

               Respondent,

_____/

**THE ZALEWSKI LAW FIRM**
**By:  PAUL J. ZALEWSKI (P61693)**
*Attorney for Petitioner*
29199 Ryan Road
Warren, MI 48092
(586) 573-8900
ZalewskiLegal@gmail.com

**BRIAN E. FRITZ (#3211621)**
*Attorney for Respondent*
2248 Kenilworth Ave.
Los Angeles, CA 90039-3010
(786) 877-8014
Brian.Fritz@ff.com

_____/


# **EXHIBIT B**

IN THE STATE OF MICHIGAN

AMERICAN ARBITRATION ASSOCIATION

SCHWAB INDUSTRIES, INC.

                Claimant,

v.

FARADAY & FUTURE INC.,

                Respondent.

Case No. 01-18-0003-8415
Arbitrator - Gene J. Esshaki

---

Paul J. Zalewski (P61693)
The Zalewski Law Firm
*Attorney for Claimant*
29199 Ryan Road
Warren, MI 48092
(568) 573-8900
(568) 573-7695 (Fax)
*zalewskilegal@gmail.com*

Rachel J. Feldman *(#246394) (pro hac vice)*
White & Case LLP
*Attorneys for Respondent*
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
(213) 620-7700
(213) 452-2329 (Fax)
*rfeldman@whitecase.com*
*peter.dagostino@whitecase.com*

Benjamin W. Jeffers (P57161)
Hickey Hauck Bishoff & Jeffers, PLLC
*Attorneys for Respondent*
One Woodward Avenue, Suite 2000
Detroit, MI 48226
(313) 964-8600
(313) 964-8601 (Fax)
*bjeffers@hhbjlaw.com*

## CONSENT AWARD

Based on the stipulation of the Claimant, Schwab Industries, Inc. ("Claimant"), and the Respondent, Faraday&Future Inc. ("Respondent" and, together with Claimant, the "Parties"), in this arbitration proceeding, by and through their respective legal counsel, and both the Arbitrator in this matter and the American Arbitration Association ("AAA") being fully advised in the premises, it is hereby agreed, decreed and ordered that pursuant to AAA Rule of Commercial Arbitration R-48 the following Consent Award is hereby entered that sets forth the full terms of the Parties' agreement in this action:

WHEREAS, the Parties have stipulated that the Faraday&Future Engineering Services Agreement dated June 24, 2018 (the "ESA") contains a valid arbitration clause that confers proper jurisdiction in AAA in the State of Michigan over this arbitration proceeding and it has been determined by the Arbitrator in this matter that the ESA governs the terms of the parties' contractual business relationship and this arbitration proceeding. (**Exhibit A**, ESA, at ¶ 9; **Exhibit B, Pre-Hearing Order Number One Dated November 30, 2018; Exhibit C, Order Dated September 4, 2019 Regarding Claimant's Motions *In Limine***).

WHEREAS, Claimant's Demand for Arbitration in this matter raises claims against Respondent for breach of the ESA due to Respondent's alleged non-payment of invoices and work in process parts.

2

WHEREAS, Claimant and Respondent have agreed to enter into this Consent Award in Claimant's favor and against Respondent in the amount set forth below, to be paid by Respondent and/or enforced by Claimant in the time and manner set forth below.

THEREFORE, IT IS HEREBY ORDERED that, subject to the below provisions which may alter the amount of this Consent Award, this Consent Award is entered in Claimant's favor and against Respondent in the amount of One Million Eight Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,881,136.15), plus an additional amount of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) representing all arbitration costs, administrative fees, arbitrator fees, expenses, attorney fees, costs and interest (the "Costs") incurred by Claimant and allocated against Respondent, for a total Consent Award in Claimant's favor and against Respondent in the amount of Two Million Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($2,031,136.15).

IT IS FURTHER ORDERED that Respondent shall pay Claimant the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) (the "Initial Payment") towards satisfaction of this Consent Award within five (5) business days of the date of this Consent Award.

3

IT IS FURTHER ORDERED that if Respondent timely remits the Initial Payment, Respondent shall have until March 31, 2020 to satisfy this Consent Award as set forth below.

IT IS FURTHER ORDERED that, if Respondent timely remits the Initial Payment, then Claimant may file on or after February 14, 2020 a Petition for Confirmation of Arbitration Consent Award (the "Petition") in the United States District Court for the Eastern District of Michigan, Southern Division (the "Federal Court") pursuant to 9 U.S.C. ¶ 1 et seq. in the amount of One Million Nine Hundred Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,931,136.15), and that Respondent shall not contest, respond, protest, or object to the Petition or otherwise seek the Federal Court or AAA to stay or vacate this Consent Award for any reason whatsoever; provided, however, that this Consent Award will not be enforceable by Claimant in any way (other than the filing of the Petition) until after March 31, 2020 and, without limiting the foregoing, Claimant shall not file any liens or levies or commence any legal or collection actions of any kind (other than the filing of the Petition) seeking to satisfy the balance of this Consent Award or to enforce any judgment entered in the Federal Court on account of this Consent Award until after March 31, 2020.

IT IS FURTHER ORDERED that, if Respondent has tendered the Initial Payment to Claimant within five (5) business days of the date of this Consent

Award, and if Respondent further tenders an additional payment to Claimant of One Million Seven Hundred Eighty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then this Consent Award and any recognition by the Federal Court of this Consent Award resulting from the filing of a Petition shall be deemed to be fully paid and satisfied, any right to receive payment of the Costs shall be deemed waived by Claimant, and Claimant shall file notice of the satisfaction of the Consent Award and any related recognition thereof with the Federal Court to the extent necessary.

IT IS FURTHER ORDERED that, if Respondent does not timely remit the Initial Payment, then Respondent shall be deemed to be in default under this Consent Award and Claimant shall be entitled to immediately file the Petition with the Federal Court in the amount of Two Million Thirty-One Thousand One Hundred Thirty-Six and 15/100 Dollars ($2,031,136.15) and to file any liens, levies or commence any legal or collection actions necessary to satisfy this Consent Award and enforce any judgment entered in the Federal Court on account of this Consent Award.

IT IS FURTHER ORDERED that, if Respondent timely remits the Initial Payment but does not make the further payment of One Million Seven Hundred Eighty-One Thousand One Hundred Third-Six and 15/100 Dollars ($1,781,136.15) on or before March 31, 2020, then Claimant shall be entitled to file any liens,

5

levies or commence any legal or collection actions necessary to satisfy this Consent Award and enforce any judgment entered in the Federal Court on account of this Consent Award (less the amount of the Initial Payment).

IT IS FURTHER ORDERED that Respondent's in-house legal counsel, Brian Fritz, will accept service of process of the Petition via e-mail service at Brian.Fritz@ff.com and that within forty-eight (48) hours after receiving such e-mail service of process of the Petition, Brian Fritz shall sign and return to Claimant's counsel a fully executed Acknowledgement of Service for entry with the Federal Court.

IT IS FURTHER ORDERED that, in the event Mr. Fritz fails to timely return a fully executed Acknowledgement of Service, then Claimant nonetheless may file the appropriate Certificate of Service with the Federal Court and Respondent shall not contest, respond, protest or object that service of process through e-mail service on Mr. Fritz was improper.

IT IS FURTHER ORDERED that the terms of this Consent Award shall control over any contrary provisions of the ESA.

THIS CONSENT AWARD RESOLVES THE LAST PENDING CLAIMS IN THIS ARBITRATION PROCEEDING AND CLOSES THE ARBITRATION.

Gene J. Esshaki, AAA Arbitrator

Approved as to form and substance,
notice of entry is hereby waived:

Paul J. Zalewski (P61693)
The Zalewski Law Firm
*Attorneys for Claimant*
29199 Ryan Road
Warren, MI 48092
(568) 573-8900
(568) 573-7695 (Fax)
*zalewskilegal@gmail.com*

Rachel J. Feldman (#246394) *(pro hac vice)*
White & Case LLP
*Attorneys for Respondent*
555 South Flower Street, Suite 2700
Los Angeles, California 90071-2433
(213) 620-7700
(213) 452-2329 (Fax)
*rfeldman@whitecase.com*
*peter.dagostino@whitecase.com*

Benjamin W. Jeffers (P57161)
Hickey Hauck Bishoff & Jeffers, PLLC
*Attorneys for Respondent*
One Woodward Avenue, Suite 2000
Detroit, MI  48226

7

(313) 964-8600
(313) 964-8601 (Fax)
*bjeffers@hhbjlaw.com*

Dated: October 30, 2019

8

# Exhibit A



FARADAY FUTURE
ENGINEERING SERVICES AGREEMENT

No. [SOW document number]
Version 1.0

This Engineering Services Agreement (the "Agreement") is made and entered into as of this April 1, 2018 ("Effective Date") by and between Faraday&Future Inc., a California corporation located at 18455 S. Figueroa St., Gardena, CA 90248 ("Company"), and Schwab Industries, Inc., a Michigan corporation located at the address set forth on the signature page hereto (the "Developer") (collectively, the "Parties" and individually, "Party").

WHEREAS, Company is in the business of designing and developing luxury electric vehicles for intended manufacture.

WHEREAS, Developer is in the business of designing, manufacturing and selling metal stampings and assemblies (the "Product").

WHEREAS, Company wishes to engage Developer, and Developer wishes to undertake such activities to design, manufacture and supply the Products as more fully set forth herein.

NOW, THEREFORE, based on the foregoing facts and in consideration of the mutual covenants and conditions contained in this Agreement, Company and Developer hereby agree as follows:

1. <u>DEFINITIONS</u>. For purposes of this Agreement and any Statement of Work ("SOW"), the following definitions shall apply to the terms set forth or referred to in this Section 1; the definitions of terms in the singular herein shall apply to such words when used in the plural where the context so permits and vice versa; any use of "and" herein shall be deemed to mean "and/or".

1.1. "Affiliates" means any business entity that one Party controls, is controlled by, or is under common control with such Party.

1.2. "Background Intellectual Property Rights" means Company's Intellectual Property or Developer's Intellectual Property, as applicable, except for any Foreground Intellectual Property Rights.

1.3. "Claim" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or other, whether at law, in equity or otherwise.

1.4. "Confidential Information" has the meaning set forth in Section 5.1.

1.5. "Contract" has the meaning set forth in Section 2.1.

1.6. "Correct Invoice" is an invoice which (a) references a valid Company Purchase Order("PO"), (b) conforms 100% to the deliverables and specifications specified in the SOW, (c) the deliverables invoiced have been performed by Developer to Company's satisfaction and acceptance, and (d) contains such additional information required by the relevant SOW and/or PO.

1.7. "Deliverables" means any information, material or item that is: (i) specifically listed as a deliverable in the applicable Statement of Work or PO; or (ii) produced by or on behalf of Developer in connection with Developer's performance under the Contract.

1.8. "Developer Parties" means Developer, its Affiliates, customers (other than Company), subcontractors and successors and assigns, and each of their respective Representatives.

1.9. "Developer's Intellectual Property" means all Intellectual Property Rights owned by or licensed to Developer by a non-Party to this Agreement, including any of Developer's Background Intellectual Property Rights used in the design, production and manufacturing of the Products.

1.10. "Dispute" has the meaning set forth in Section 10.

1.11. "Effective Date" means the date first set forth above.

1.12. "Company Parties" means Company, its Affiliates, customers, subcontractors and successors and assigns, and each of their respective Representatives.

1.13. "Company's Intellectual Property" means all Intellectual Property Rights owned by or licensed to Company, including all Foreground Intellectual Property Rights and any of Company's Background Intellectual Property Rights used in the design, production and manufacturing of the Products.

1.14. "Force Majeure Event" has the meaning set forth in Section 11.3.

1.15. "Foreground Intellectual Property Rights" means any and all of the Intellectual Property Rights developed with respect to,

or for incorporation into, the Products, that are either developed by Company alone, by Company and Developer jointly or by Developer alone in connection with this Agreement.

1.16. "Indemnified Parties" has the meaning set forth in Section 9.1.

1.17. "Indemnifying Party" means Developer.

1.18. "Intellectual Property Rights" means any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), mask works, patents, and other intellectual property rights therein and other similar designations arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof.

1.19. "Law" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, order, writ, judgment, injunction, decree, stipulation, award, determination or other requirement or rule of law of any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

1.20. "Losses" has the meaning set forth in Section 9.1.

1.21. "Personnel" of a Party means any agents, employees, contractors or Subcontractors engaged or appointed by such Party.

1.22. "Price" has the meaning set forth in Section 3.2.

1.23. "Product" has the meaning set forth in the preamble of this Agreement and further described in the Specifications attached to the SOW or PO.

1.24. "Product Development" has the meaning set forth in Section 2.1.

1.25. "Products Supply" has the meaning set forth in Section 3.1.

1.26. "Purchase Order" or "PO" means Company's purchase order issued to Developer hereunder, which may, among other things, specify items such as: (a) the Products to be purchased; (b) the quantity of each of the Products ordered; (c) the delivery date; (d) the unit Price for each of the Products to be purchased; (e) the billing address; and (f) the delivery location. The terms of this Agreement shall be incorporated into each and every PO, any amended PO, and any release issued by Company to Developer.

1.27. "Representatives" means a Party's Affiliates and each of their respective Personnel, officers, directors, partners, shareholders, attorneys, third-party advisors, successors and permitted assigns.

1.28. "Services" means all of the services, materials and Deliverables which shall be provided by the Developer under the Contract.

© 2018 Faraday Future Inc. All rights reserved: This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

No. [SOW document number]
Version 1.0

1.29. "Specifications" means the specifications for the Product provided by Company to Developer.

1.30. "Statement of Work" or "SOW" has the meaning set forth in Section 2.1.

1.31. "Subcontractors" has the meaning set forth in Section 4.3.

1.32. "Term" has the meaning set forth in Section 8.1.

1.33. "UCC" means the Uniform Commercial Code, as adopted in the State of Michigan.

2. PRODUCT DEVELOPMENT

2.1. Product Development. During the Term, Developer shall perform the Services and Deliverables for the development of the Product ("Product Development") in compliance with the requirements set forth in the Contract. The "Contract" for the Product Development of Product shall only include this Agreement, the fully executed SOW, appendices and exhibits attached to the SOW, any corresponding PO issued by Company, and any approved amendments to the SOW or PO. Developer is not authorized to begin performing Services or Deliverables until a PO has been issued. A subsequent agreement between the parties containing terms and conditions for production of the Product will be executed prior to the expiration of the Term of this Agreement.

2.2. Changes in Scope. Company may at any time notify Developer of a change request to make changes to the scope, definition, or schedule of deliverables for the Product Development. Upon receipt, Developer shall evaluate each change request as soon as possible and provide a written estimate (with sufficient supporting information) of any required increase or decrease in the cost of or time required for the performance of the Product Development.

2.3. Acceptance Period. Company shall have thirty (30) days (the "Acceptance Period") to determine the acceptability of any deliverable. Within thirty (30) business days following the end of the Acceptance Period, Company shall (a) provide written notice of acceptance to Developer, or (b) provide written notice of non-acceptance with reasonable written comments to Developer regarding the deficiencies of the deliverable(s). If changes are required by Company, Developer shall have thirty (30) days to correct the deficiency noted therein and resubmit the deliverable to Company beginning a new Acceptance Period. This process shall continue until Developer has corrected all deficiencies and Company accepts the deliverable.

2.4. Delays Caused By Company. Developer shall not be liable for any alleged delays in performance under this Agreement, any Contract Documents, SOWs or POs, if such delays are caused by the Company due to Product changes, Product Specification changes, SOW changes, scope of work changes, Company's failure to issue a proper PO or delays in supplying any raw materials that are to be provided to Developer by the Company. In the event of any delays in performance of Product Development that are caused by the Company, Developer shall have the right to cease performance under this Agreement, any Contract Documents, SOWs or POs until Company cures the event causing such delays.

2.5. Agreement to Govern. If there is any conflict, contradiction, inconsistency or incompatibility between the terms and conditions of any Contract documents, SOWs, or POs, then this Agreement shall exclusively govern.

3. INDEPENDENT CONTRACTOR STATUS; SUBCONTRACTORS:

3.1. Independent Contractor Status. It is understood and acknowledged that the Product Development which Developer will provide to Company hereunder shall be in the capacity of an independent contractor and not as an employee or agent of Company. Developer shall control the

methods, operations, funds, conditions, time, details, and means by which Developer performs the Product Development. Company shall have the right to inspect the work of Developer as it progresses solely for the purpose of determining whether the work is completed according to the applicable SOW and/or PO. Developer has no authority to commit, act for or on behalf of Company, or to bind Company to any obligation or liability.

3.2. Developer's Personnel. Developer shall be solely responsible for the employment, control, and conduct of all Developer's Personnel, and Developer shall be solely responsible for making all withholdings and payments of all payroll taxes and similar obligations, including income taxes, FICA, social security taxes, federal and state unemployment insurance contributions, state disability premiums, workers compensation, and/or any similar taxes and fees relating to the Product Development, for each of Developer's Personnel authorized to perform hereunder. As such, Developer's Personnel are not entitled to any employment rights or benefits from Company or its Affiliates and shall in no way be deemed and/or construed to be employees of Company or its Affiliates. Developer shall have no power to hire, discipline or fire Developer's Personnel or to supervise or control the work schedules or conditions of employment, except as otherwise set forth herein.

3.2.1. On-Site Restriction. Developer shall not be permitted and hereby promises that it shall not permit any Developer's Personnel that are not recognized as W2 employees by Developer to work on-site at any facilities, buildings, or premises owned or leased by Company or its Affiliates.

3.3. Third Party Subcontractors. Developer shall be permitted to subcontract performance of work or processes called for under the SOW or any PO to a third party ("Subcontractor") without the prior consent of Company. Any subcontractor assignment does not relieve Developer of its own individual duties or obligations under the SOW or PO. Developer shall be solely responsible for any costs and expenses incurred by Subcontractors. However, if Company directs or otherwise requires Developer to subcontract all or a portion of its duties or obligations under the SOW or PO to any subcontractor, then Developer shall not be responsible for a breach of any Contract documents, SOW or PO caused by that subcontractor's failure to meet its warranty, delivery, or other contractual obligations.

4. CONFIDENTIAL INFORMATION:

4.1. Confidential Information. "Confidential Information" means all non-public, confidential or proprietary information and materials of any of the Company Parties furnished by or on behalf of any of the Company Parties to Developer and/or Developer's Representatives, including but not limited to all drafts, copies, summaries, and extracts of any of the foregoing, and/or otherwise arising from and/or in connection with this Agreement, whether disclosed orally or disclosed or accessed in written, electronic, or other form or media, and whether or not marked as such, including trade secrets. Confidential Information shall not include any information that: (a) is or becomes generally available to the public other than as a result of Developer's breach of this Agreement (except for personally identifiable information which shall remain Confidential Information); (b) is obtained by Developer on a non-confidential basis from a third-party that was not legally or contractually restricted from disclosing such information; or (c) Developer establishes by documentary evidence, was lawfully in Developer's possession prior to the date of disclosure hereunder. It is further contemplated that the terms and

© 2018 Faraday Future Inc. All rights reserved: This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

No. [SOW document number]
Version 1.0

existence of this Agreement shall be treated as Confidential Information.

4.2. <u>Restricted Use.</u> All Confidential Information is and shall remain the property of Company or the Company Parties at all times. Developer shall use such Confidential Information only for the purpose, and to the extent necessary, of fulfilling its obligations under this Agreement and any applicable SOW or PO. Upon Company's request or the termination of the business relationship between the parties, whichever is earlier, Developer shall promptly return all documents and other materials containing Confidential Information.

4.3. <u>Nondisclosure.</u> Developer agrees and acknowledges on behalf of Developer and Developer's Representatives that they shall have no proprietary interest in the Confidential Information and shall not disclose, communicate nor publish the nature or content of such Confidential Information to any person or entity, nor use, except as authorized in writing by Company, any of the Confidential Information it (or any of the Developer's Representatives) produces, receives, acquires or obtains from any of the Company Parties and/or as a result of or arising from this Agreement. The Developer shall take (and cause the Developer's Representatives to take) all necessary steps to ensure that the Confidential Information is securely maintained, including by causing all Developer's Representatives to sign a non-disclosure agreement regarding the Confidential Information herein with no less restrictive terms than the ones contained in this <u>Section 5.3</u> before the permissible disclosure of any such Confidential Information. In the event the Developer (or any of the Developer's Representatives) becomes legally compelled to disclose any of the Confidential Information, Developer shall provide Company with prompt notice thereof and shall not divulge any information until Company has had the opportunity to seek a protective order or other appropriate remedy to curtail such disclosure. If such actions by Company are unsuccessful, or Company otherwise waives its or the Company Parties' right to seek such remedies, the relevant Developer's Representatives shall disclose only that portion of the Confidential Information which it is legally required to disclose.

4.4. <u>Remedies.</u> Developer agrees that any breach or threatened breach of this <u>Section 5</u> could cause not only financial harm, but also irreparable harm, to Company, and that money damages will not provide an adequate remedy. As such, in addition to any other rights or remedies provided hereunder or by Applicable Law, Company shall be entitled to injunctive relief for any threatened or actual breach of this <u>Section 5</u>, without proof of damages or the need to post security. Pursuit of any remedy at law or in equity shall not be deemed as an election of remedies.

5. <u>INTELLECTUAL PROPERTY:</u>

5.1. <u>Ownership.</u> Each of the Parties acknowledges and agrees that:

5.1.1. each Party retains exclusive ownership of its Background Intellectual Property Rights;

5.1.2. Company does not transfer to Developer any of its Background Intellectual Property Rights, and Developer may not use any of Company's Background Intellectual Property Rights other than to develop, produce and supply Products to Company hereunder;

5.1.3. Developer does not transfer to Company any of Developer's Background Intellectual Property Rights, except that Developer grants to Company and its Affiliates the right to resell Products or incorporate Products purchased from Developer into finished

goods and to sell such finished goods to Company and its Affiliates, and each of their customers;

5.1.4. all Foreground Intellectual Property Rights will be owned by Company;

5.1.5. Developer hereby irrevocably assigns to Company all of Developer's right, title and interest in and to all Foreground Intellectual Property Rights, and, to the extent that any Foreground Intellectual Property Rights are copyrightable works or works of authorship (including computer programs, technical specifications, documentation and manuals), the Parties agree that such works are "works made for hire" for Company under the US Copyright Act; and

5.1.6. Developer shall only use the Foreground Intellectual Property Rights to produce and supply Products to Company and its Affiliates.

5.2. <u>Prohibited Acts.</u> Each of the Parties shall not:

5.2.1. take any action that may interfere with the other Party's Intellectual Property Rights, including such other Party's ownership or exercise thereof;

5.2.2. challenge any right, title or interest of the other Party in such other Party's Intellectual Property Rights;

5.2.3. make any Claim or take any action adverse to such other Party's ownership of its Intellectual Property Rights;

5.2.4. register or apply for registrations, anywhere in the world, the other Party's trademarks or any other trademark that is similar to such other Party's trademarks or that incorporates such trademarks in whole or in confusingly similar part;

5.2.5. use any mark, anywhere, that is confusingly similar to the other Party's trademarks;

5.2.6. misappropriate any of the other Party's trademarks for use as a domain name without such other Party's prior written consent; or

5.2.7. alter, obscure or remove any of the other Party's trademarks or trademark or copyright notices or any other proprietary rights notices placed on the products purchased under this Agreement (including Products), marketing materials or other materials.

5.3. <u>License of Developer's Background Intellectual Property Rights.</u> Developer grants to Company and its Affiliates an irrevocable, non-exclusive, worldwide, perpetual, royalty-free license, with the right to grant sublicenses, to use Developer's Background Intellectual Property Rights to produce, procure use, sell and to obtain, from alternate sources, products and services similar to the Products (including related systems and components) following the expiration or earlier termination of this Agreement and in connection with Company's rights hereunder to purchase Products from an alternative source at any time during the Term hereof.

5.4. <u>Developer's Representatives.</u> Developer shall ensure that all Developer's Representatives performing or engaged under this Agreement are informed of Company's rights and obligations under this Agreement and Developer shall provide any legal notices required by applicable Law necessary to ensure that any Intellectual Property Rights prepared by or on behalf of any such Developer's Representatives are the property of Company as contemplated by this Agreement. Developer shall, as necessary, obtain the assignment and conveyance to Company, or to Developer for the benefit of Company, of any patent or other proprietary rights that such persons or entities may then have or may have in the future to such Intellectual Property Rights.

5.5. <u>License to Third Party Content.</u> Developer shall advise Company in advance and in writing when Developer (or any Developer's Representatives) intends to include any third-

© 2018 Faraday Future Inc. All rights reserved: This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



party content into any of the Products, and such third-party content shall not be included in any Products without the prior written approval of Company. To the extent third party content of any kind is embodied in any Products, Developer hereby grants, or shall cause such third party to grant, Company and its Affiliates a non-exclusive, worldwide, perpetual, irrevocable fully paid up license to use such third party content to the extent Company (or its Affiliates) determines it needs or desires to use such third-party rights to obtain the benefit of the Products Development and/or to use, maintain, modify, enhance, perform, distribute, combine with others, copy and/or create derivative works of the Products.

5.6. Trademarks. Developer shall not have any right to use the names, logos, symbols and/or any other trademarks of Company or its Affiliates unless and until each such use is approved in advance and in writing by Company. Developer shall not directly or indirectly obtain or attempt to obtain during the Term or at any time thereafter, any right, title or interest in or to said marks. All uses inure to the benefit of Company or its Affiliates. Developer's permission to use the marks may be withdrawn by Company at any time at its discretion upon written notice to Developer by Company, and, upon delivery of such notice, Developer shall immediately discontinue use of the marks. Any press release or announcement or identification by Developer of its relationship with Company in connection with this Agreement and/or the subject matter thereof must be pre-approved in writing by Company in each instance.

6. PAYMENTS; INVOICES; EXPENSES:

6.1. Payment Terms. Payment terms shall be net thirty (30) days from the date that any Correct Invoice is submitted to Company by Developer for any work, Deliverables, Products, Product Development, or Services provided to Company. If Company fails to pay Developer according to these agreed upon payment terms, then Developer shall be excused and relieved from all further performance under any existing SOW or PO, Developer may terminate this Agreement with cause (as set forth in Section 7.4) and further, Developer shall have the right to demand full payment in advance for any future work, Deliverables, Products, Product Development, or Services that Developer agrees to provide to Company under any existing or new PO.

6.2. Expenses. Unless otherwise specifically set forth in this Agreement, the SOW or associated POs, Developer shall bear all of its own expenses arising from the performance of its obligations under this Agreement. If, pursuant to the relevant SOW or PO, Company is to reimburse certain expenses of Developer, such expenses must be pre-approved in writing by Company prior to submission of a Correct Invoice and accompanied by receipts and supporting documentation acceptable to Company. All Developer expenses not pre-approved by Company or not otherwise meeting the requirements of this Agreement, the SOW or PO shall be the Developers' sole responsibility.

7. TERM;TERMINATION:

7.1. Term. This Agreement shall commence as of the Effective Date and shall continue until the later of the expiration or termination of the last SOW or on March 31, 2019 ("Term"), unless sooner terminated as set forth in this Section 7 or otherwise set forth herein.

7.2. Termination Without Cause. By providing at least thirty (30) days prior written notice to the other Party, both Company and Developer, in its/their sole discretion, may terminate this Agreement or any SOW or PO, in whole or in part, at any time without cause, and without liability except for Company's required payment of any work, Deliverables, Products, Product Development, or Services provided to

Company under any existing or new PO that has been actually rendered, and reimbursement for authorized expenses actually incurred and approved, prior to the termination date. Upon notice of termination, Developer shall (i) terminate all or the specified portion of the work under the SOW and PO; (ii) transfer title to and deliver to Company or its designee, the usable and merchantable Products, work in process and raw materials/components that Developer has produced and/or purchased based upon the Releases issued by Company; (iii) upon request, cooperate with Company in effectuating the re-source of the goods and services to an alternate supplier specified by Company.

7.3. Payment to Developer. Upon termination under this Section 7, within thirty (30) days after receiving notice of termination, Company shall pay to Developer the following documented amounts without duplication: (i) the PO purchase price for all finished and completed Products for which payment has not been previously made and which were produced in accordance with the SOW, any PO; (ii) Developer's reasonable and actual cost of the usable and merchantable work in process; (iii) Developer's reasonable direct and actual costs incurred in settling claims of its subcontractors that are rendered unrecoverable by the termination; and (iv) Developer's reasonable and actual costs in storing and protecting Company's property.

7.4. Termination With Cause. Either Party may terminate this Agreement, effective upon written notice to the other Party (the "Defaulting Party"), if the Defaulting Party:

7.4.1. Breaches this Agreement, and such breach is incapable of cure, or with respect to a breach capable of cure, the Defaulting Party does not cure such breach within fifteen (15) days after receipt of written notice of such breach;

7.4.2. Commits any act or becomes involved in any situation or occurrence which brings Company or Developer, or any Company Parties or Developer Parties, into public disrepute or contempt, or which damages or disparages the goodwill or reputation of Company or Developer, or Company Parties or Developer Parties, or which reflects unfavorably upon Company or Developer, or Company Parties or Developer Parties, as reasonably determined by Company or Developer in its/their discretion, and Company or Developer fails to cure the situation within fifteen (15) days of such situation or occurrence to Company's or Developer's respective satisfaction;

7.4.3. Breaches the intellectual property, confidentiality, or other provisions of this Agreement.

7.4.4. Becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law, which is not fully stayed within seven (7) business days or is not dismissed or vacated within forty-five (45) days after filing.

7.5. Effect of Expiration or Termination.

7.5.1. Immediately upon the effectiveness of a notice of termination, Developer shall, unless otherwise directed by Company:

7.5.1.1. promptly terminate all performance under this Agreement and under any outstanding SOW or PO;

7.5.1.2. transfer title and deliver to Company all Products (including equipment and tooling) that has been fully paid for by Company;

7.5.1.3. return to Company or dispose (in accordance with Company's instructions and reimbursement of Developer's actual, reasonable costs associated with such

© 2018 Faraday Future Inc. All rights reserved: This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

No. [SOW document number]
Version 1.0

disposal upon proof of costs) any property furnished by or belonging to Company or its Affiliates, so long as Company has fully paid Developer in accordance with the terms of this Agreement and/or any PO;

7.5.1.4.  Developer shall devote its best good faith efforts prior to the effective termination date or expiration date to cooperate with Company to minimize the interruption of the Products Development or Products Supply caused by termination or expiration and the appointment of another supplier.  During this period, Developer also agrees to give Company all reasonable and prompt cooperation toward transferring, with approval of third parties in interest, all contracts and other arrangements with third parties or others, upon being duly released from the obligation thereof;

7.5.2.  Expiration or termination of the Term will not affect any rights or obligations of the Parties that come into effect upon or after termination or expiration of this Agreement; or

7.5.3.  Upon the expiration or earlier termination of this Agreement, each Party shall:

7.5.3.1.  Return to the other Party or destroy all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information;

7.5.3.2.  Permanently erase all of the other Party's Confidential Information from its computer systems, except for copies that are maintained in accordance with the Party's internal recordkeeping policies;

7.5.3.3.  On a pro rata basis, repay all fees and expenses paid in advance for any Product Development work that was not completed as of the date of termination; and

7.5.3.4.  Certify in writing to Company that it has complied with the requirements of this Section 7.5.

7.5.4.  Neither Party will be liable to the other Party for any damage of any kind incurred by the other Party by reason of the expiration or earlier termination of this Agreement. Termination of this Agreement will not constitute a waiver of either Party's rights, remedies or defenses under this Agreement, at Law, in equity or otherwise.

7.6.  Survival. Notwithstanding any other terms hereof, the rights and obligations of the parties set forth in Sections 3, 4, 6, 7, 8, 9, 10, and 11, and any other terms under a SOW or PO indicated as surviving, and any right or obligation of the Parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, will survive any such termination or expiration of this Agreement.

8.  LIMITED INDEMNIFICATION, REPRESENTATIONS AND WARRANTIES:

8.1  Limited Indemnification. Subject to the terms and conditions of this Agreement, Indemnifying Party shall indemnify, defend and hold harmless the Company Parties and each of their Representatives, officers, directors, employees, agents, contractors, Affiliates, successors and permitted assigns (collectively, "Indemnified Parties") against any and all Claims, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers, incurred by

any Indemnified Party (collectively, "Losses"), relating to, arising out or resulting from any third-party Claim or any direct Claim against Indemnifying Party alleging material defects in the particular Product produced by Developer if such Claims arise from allegations that the Product was not produced pursuant to the particular Specifications and tolerances provided by the Company.

8.2  Representations and Warranties.  Developer (on behalf of itself and its Representatives) represents, warrants and covenants that:

8.2.1 it shall perform the Product Development in a competent and workmanlike manner in accordance with the level of professional care customarily observed by highly skilled professionals rendering similar services as provided hereunder;

8.2.2 all Products, tooling, and other goods provided hereunder shall a) comply with all performance standards and product characteristics, including without limitation Specifications, drawings, descriptions or samples, furnished and/or specified by Company, (b) be merchantable, (c) be free from defects in material and workmanship, and (d) to the extent that Developer designs any goods, or Company relies on Developer's expertise in any aspect of the design of the goods communicated by Developer to Company, those goods will be fit and sufficient for the purposes intended;

8.2.3 it shall use reasonable efforts to ensure that its Representatives comply with all Laws;

8.2.4 it shall use reasonable efforts to notify Company if Developer learns that any of the Deliverables do not comply with any applicable Laws relating to the Deliverables;

8.2.5 Developer is the lawful owner or licensee of all programs and/or Developer's Intellectual Property used by it in the Products and that such Products and Intellectual Property Rights have been lawfully developed or acquired by Developer and Developer has the right to permit Company and its Affiliates to access or use such;

8.2.6 Developer has all right, power and authority (a) to grant Company good and marketable title to the Products and tooling, free from any third party interests, liens or encumbrances, except those created by Developer due to any breach of the Company's obligations under this Agreement or any PO, including but not limited to Company's payment obligations to Developer, and (b) to grant the license to the Developer's Background Intellectual Property to Company and its Affiliates as more fully described above, without need for any further consent of any third party, and exercisable without any interference;

8.2.7 Developer has no other agreement or relationship or commitment that conflicts with Developer's obligations to Company under this Agreement, including, but not limited to, any agreement to assign inventions, trademarks, copyrights, ideas or other Intellectual Property Rights.

9.  MEDIATION; ARBITRATION:

9.1  The laws of the State of Michigan shall apply to all disputes between the Parties, including but not limited to the application, construction, effect, enforcement, interpretation of this Agreement, the SOW, any applicable POs and all other Contract documents and contractual relations between the Parties of any kind whatsoever. The Parties further agree to submit all controversies or claims arising out of their contractual business relationship, this Agreement, the SOW, any applicable POs, any Contract documents or any other dispute of any kind to binding arbitration administered by the American Arbitration Association (AAA) at a location to be

© 2018 Faraday Future Inc. All rights reserved: This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



determined in Macomb County, Michigan, including, but not limited to, any and all issues that arise from: (i) any document, agreement or procedure related to or delivered in connection with this Agreement, the SOW, or any PO; (ii) any protocol, dispute, claim, controversy or issue that touches, concerns, is related to or is delivered in connection with this Agreement, the SOW, or any PO, in any way, shape or form, regardless of substance or procedure; (iii) the alleged breach of this Agreement, the SOW, or any PO, and/or; (iv) any claims for damages resulting from any business conducted between the Parties related to this Agreement, the SOW, or any PO, including claims of injury to persons, property or business interests (torts). The arbitration proceedings shall be conducted under the then currently published Commercial Arbitration Rules for AAA and shall be decided by a single AAA arbitrator. The arbitrator shall have the authority to resolve any dispute as to whether an issue is arbitrable.

9.2 The decision of the arbitrator shall be in writing and shall be final and binding upon both Parties. Any award may be enforced by either Party, as applicable, in a court of competent jurisdiction in the State of Michigan. Each Party shall bear its own cost of preparing and presenting its case, including the fees of the arbitrator; provided, however, the parties agree that the prevailing Party in such arbitration shall be awarded its arbitrator costs, arbitration administration, and other AAA related fees incurred in connection with the Arbitration. The arbitrator is not empowered to award damages in excess of those permitted under this Agreement or the applicable SOW and attorneys' fees and legal costs and expenses. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. Section 1 et seq., to the exclusion of state laws inconsistent therewith and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. All negotiations and proceedings pursuant to this Section 10 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence and any additional confidentiality protections provided by applicable law.

9.3 Nothing herein shall serve as a waiver by any Party to claim injunctive relief where applicable under this Agreement.

10. MISCELLANEOUS:

10.1. Export Control. Developer acknowledges that any technical information, know-how, drawings, designs, specifications, models, software, hardware or other technical data provided by Company may be subject to the United States export control laws and regulations including the Export Administration Regulations (EAR) administered by Department of Commerce, Bureau of Industry and Security and the Foreign Asset Control Regulations administered by the Department of Treasury, Office of Foreign Assets Control (OFAC). Where applicable, Developer agrees to comply with all applicable export control and sanctions laws and regulations of the U.S. and any other relevant country (if any) including, but is not limited to, abiding by U.S. sanctions, embargoes and prohibitions on transactions with restricted parties and countries. This includes the prohibition on the export, reexport or transfer of commodities, materials, software and technology subject to this Agreement for end-uses such as missile technology, sensitive nuclear, or chemical biological weapons end uses. Where applicable, Developer agrees to notify Company if Deliverables to be provided to Company under this Agreement are subject to the U.S. Department of State, International Traffic in Arms Regulations (ITAR) or the Wassenaar Munitions List prior to the delivery of the Deliverables. Developer will send notifications to Company's Export Compliance Department via e-mail to exportcontrol@faradayfuture.com.

10.2. Insurance. During the Term and for a period of five (5) years thereafter, Developer shall, at its own expense, maintain and carry in full force and effect, with financially sound and reputable insurers, the following types of insurance coverage: (a) commercial general liability insurance (including premises operations, product liability, and products and completed operations) for a sum no less than Five Million ($5,000,000.00) Dollars; (b) professional liability/errors and omissions insurance (with no exclusion for engineering exposure) for a sum no less than One Million ($1,000,000.00) Dollars; (c) worldwide intellectual property insurance for at least the value of Developer's Background IP; (d) automobile liability insurance on all owned, non-owned, and hired vehicles for a sum no less than One Million ($1,000,000.00) Dollars and physical damage insurance for the actual cash value of each such vehicle, (e) employer's liability insurance for a sum no less than One Million ($1,000,000.00) Dollars; and (f) employee dishonesty/theft insurance for a sum no less than Five Hundred Thousand ($500,000.00) Dollars. Immediately upon the signing of this Agreement, Developer shall provide Company with a certificate of insurance evidencing the insurance coverage specified in this Section 10.2. The certificate of insurance shall name Company as an additional insured and loss payee. Developer shall provide Company with ten (10) days' advance written notice in the event of a cancellation or material change in such insurance policy. Developer waives and Developer shall cause its insurers to waive, any right of subrogation or other recovery against Company, its Affiliates, and their insurers.

10.3. Force Majeure. Any delay or failure of either Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's reasonable control, without such Party's fault or negligence, and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include, without limitation, natural disasters, embargoes, explosions, riots, weather, strikes, lockouts, wars, trade restrictions, or acts of terrorism) (each, a "Force Majeure Event"). Company's or Developer's financial inability to perform, changes in cost or availability of materials, components or services, market conditions, or Subcontractor's actions or contract disputes shall not be included in the definition of Force Majeure Event. Company and Developer shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. Both Company and Developer shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement.

10.4. Severability. If any term or provision of this Agreement is found to be invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal, or unenforceable, this Agreement may be modified to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

10.5. Entire Agreement/Modification. No oral agreements, promises, representations, statements or conversations between the Parties hereto or their Representatives, whether the same shall have been express or implied, occurring either before or after the execution of this Agreement, shall

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.



**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

be construed as having any bearing or affect upon this Agreement or any portion hereof, it being understood that this Agreement (including any applicable Exhibits, SOWs and POs) constitutes the entire agreement between Company and Developer relating to the transactions contemplated hereby. The Parties agree that this Agreement shall supersede all prior offers, contracts, agreements and arrangements between the Parties. This Agreement may not be modified or extended except by a written agreement signed by an authorized representative of each Party.

10.6.  Form Documents Do Not Supersede Agreement.  The Parties may use standard business forms or other communications, but use of such forms is for convenience only and does not alter the provisions of this Agreement.  Neither Party shall be bound by, and each specifically objects to, any provision that is different from or in addition to this Agreement or any applicable Exhibits and/or SOWs and POs (whether proffered verbally or in any quotation, invoice, shipping document, acceptance, confirmation, correspondence, or otherwise), unless such provision is specifically agreed to in a writing and signed by both Parties and indicates an intent to supersede the terms hereof. Any terms and conditions set forth, incorporated or adopted by reference into  the SOW or any PO between the parties that alter, conflict or modify the terms and conditions set forth in this Agreement shall not be binding on any Party and shall have no force and effect whatsoever, unless agreed to a writing and signed by both Parties and indicates an intent to supersede the terms hereof.

10.7.  Waiver. No waiver by any Party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

10.8.  Assignment. Developer shall not assign, transfer, delegate, or subcontract any of its rights or obligations under this

Agreement without the prior written consent of Company. Any purported assignment or delegation in violation of this Section 11.10 shall be null and void. No assignment or delegation shall relieve the Developer of any of its obligations hereunder. Company may at any time assign or transfer any or all of its rights or obligations under this Agreement without Developer's prior written consent.

10.9.  Successors and Assigns. This Agreement is binding on and inures to the benefit of the Parties and their respective successors and permitted assigns.

10.10. No Third-Party Beneficiaries. This Agreement benefits solely the Parties and their respective successors and permitted assigns and nothing in this Agreement, express or implied, confers on any third party any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

10.11. Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in this Agreement, a signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

10.12. Headings. The headings of the various clauses in this Agreement have been inserted for the convenience of the Parties only.  They shall not be used to interpret or construe the meaning of the terms and provisions hereof.

10.13. Authority; Binding Effect. The Parties expressly declare and represent that they are represented by legal counsel, that together with their legal counsel they have read this entire Agreement, and that they fully understand the content and effect of the contractual covenants, promises and obligations set forth herein, and that they approve and accept the terms and conditions contained herein. This Agreement shall be construed and interpreted as though jointly drafted by both Parties. The Parties' designated Representatives whose signatures appear below are authorized to sign and bind the respective Parties for all legal purposes to the Agreement.

FARADAY&FUTURE INC.

By:  _____

Print Name:  _____

Title:  _____

Date:  _____

FARADAY&FUTURE INC.

By:  _____

Print Name:  _____

Title:  _____

Date:  _____

SCHWAB INDUSTRIES INC.

By:  _____

Print Name:  _____Brian  A. Gibson_____

Title:  _____CFO_____

© 2018 Faraday Future Inc. All rights reserved: This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.

**FARADAY FUTURE**
**ENGINEERING SERVICES AGREEMENT**

No. [SOW document number]
Version 1.0

Address _____ 50850 Rizzo Dr shelby twp MI 48315 _____

Date: _____ 6-24-18 _____

© 2018 Faraday Future Inc. All rights reserved. This document contains the confidential and proprietary information of Faraday Future and may not be reproduced, retransmitted or redistributed, either in whole or in part, for any reason without Faraday Future prior written consent. Printed copies of this document are Uncontrolled.

# Exhibit B

AMERICAN ARBITRATION ASSOCIATION

SCHWAB INDUSTRIES, INC.,

      Claimant,

v.                                          Case No. 01-18-0003-8415

FARADAY & FUTURE INC.,

      Respondent.

---

| Paul J. Zalewski (P61693) | Rachel Feldman (temporary admission to |
|---|---|
| The Zalewski Law Firm | Michigan Bar pending) |
| Attorney for Claimant | Catherine Simonsen (temporary admission to |
| 29199 Ryan Rd. | Michigan Bar pending) |
| Warren, MI 48092-4243 | White & Case LLP |
| (586) 573-8900 | Attorneys for Respondent |
| (586) 573-7695 (fax) | 555 South Flower Street, Suite 2700 |
| zalewskilegal@gmail.com | Los Angeles, CA 90071-2433 |
| | (213) 620-7700 |
| | (213) 452-2329 (fax) |
| | rfeldman@whitecase.com |
| | catherine.simonsen@whitecase.com |

---

## PRE-HEARING ORDER NUMBER ONE
## DATED NOVEMBER 30, 2018

The above-referenced matter is currently pending in Arbitration before the American

Arbitration Association ("AAA") and the undersigned, its duly appointed Arbitrator.  A first

Pre-Hearing Conference was conducted in this matter on November 30, 2018.  Claimant, SCHWAB

INDUSTRIES, INC., was represented in this Conference by Paul J. Zalewski, Esq. of The Zalewski

Law Firm.  Respondent, FARADAY & FUTURE INC., was represented in the Conference by

Rachel Feldman, Esq. and Peter D'Agostino, Esq. of White & Case LLP.  Matt Lacey, Case

Manager of the AAA, also participated in the Conference.

The following matters were reviewed and resolved in Pre-Hearing Conference Number One:

1. <u>PHV Admission</u>. Counsel for Respondent must expeditiously complete the PHV admission requirements established by the State Bar of Michigan. Once the PHV approval letter is issued, Respondent's counsel should submit the letter, together with an Order approving PHV admission, for entry by the undersigned. Thereafter, the undersigned will forward the executed Order of admission and the admission letter to the State Bar to complete the PHV process.

2. <u>Jurisdiction</u>. Both sides acknowledged that Section 9 of the agreement entitled *Faraday Future Engineering Services Agreement dated 6-24-18* contains a valid arbitration clause. Both sides further acknowledge that the claims set forth in the Demand for Arbitration arguable fall within the confines of the clause. Accordingly, the jurisdiction of the AAA and the undersigned has been confirmed.

3. <u>Pleading Status</u>. Claimant acknowledged that its Demand for Arbitration and the attached Engineering Services Agreement adequately sets forth the nature of its claim and no additional amendments are required at this time. Respondent has denied the allegations of the Demand by failing to answer. Respondent may file a detailed Answer to the Demand without leave on or before January 11, 2019. Thereafter, any amendments or revisions to any of the pleadings will only be granted upon motion duly made and approved by the undersigned.

4. <u>Status of Action</u>. Respondent indicated that it has lost its funding for the project upon which it has engaged Claimant. It is attempting to replace the funding and hopes to do so within the next 60 days. Given such circumstances, it is not appropriate to

2

engage in full scale discovery in this matter until the status of Respondent's financing is clear.

     5.    <u>Limited Discovery</u>.  The parties may engage in limited document discovery in which they seek specific documents from opposing counsel.  The parties shall follow the time schedules set forth in the Michigan Rules of Court for filing document requests and responding thereto.  At this time, no Interrogatories, Requests to Admit or Depositions will be permitted.

     6.    <u>Motion for Partial Summary Judgment</u>.  Claimant has indicated a desire to file a Motion for Partial Summary Judgment.  Claimant is free to file such Motion at any time and if filed, a briefing schedule will be set.

     7.    <u>Pre-Hearing Conference Number Two</u>.  A second Pre-Hearing Conference shall be conducted in this matter on January 29, 2019, commencing at 11:00 a.m.  The Case Manager shall provide the parties with dial-in instructions and confirmation of this Conference.

No further matters were discussed during Pre-Hearing Conference Number One.

Dated:  November 30, 2018

                                                 Gene J. Esshaki, Arbitrator

4842-4182-5409, v. 1

3

# Exhibit C

AMERICAN ARBITRATION ASSOCIATION

SCHWAB INDUSTRIES, INC.,

        Claimant,

v.

FARADAY & FUTURE INC.,

        Respondent.

Case No. 01-18-0003-8415

Arbitrator – Gene J. Esshaki

| | |
|---|---|
| Paul J. Zalewski (P61693)<br>The Zalewski Law Firm<br>Attorney for Claimant<br>29199 Ryan Rd.<br>Warren, MI 48092-4243<br>(586) 573-8900<br>(586) 573-7695 (fax)<br>zalewskilegal@gmail.com | Rachel Feldman (temporary admission to<br>Michigan Bar pending)<br>Catherine Simonsen (temporary admission to<br>Michigan Bar pending)<br>White & Case LLP<br>Attorneys for Respondent<br>555 South Flower Street, Suite 2700<br>Los Angeles, CA 90071-2433<br>(213) 620-7700<br>(213) 452-2329 (fax)<br>rfeldman@whitecase.com<br>catherine.simonsen@whitecase.com<br><br>Benjamin W. Jeffers (P57161)<br>Hickey Hauck Bishoff & Jeffers, PLLC<br>Attorneys for Respondent<br>One Woodward Avenue, Suite 2000<br>Detroit, MI 48226<br>(313) 964-8600<br>(313) 964-8601 (fax)<br>bjeffers@hhbjlaw.com |

## ORDER DATED SEPTEMBER 4, 2019
## REGARDING CLAIMANT'S MOTIONS *IN LIMINE*

    The Claimant in the above-referenced Arbitration currently pending before the American

Arbitration Association ("AAA"), SCHWAB INDUSTRIES, INC., through its counsel, Paul J.

Zalewski, Esq. of The Zalewski Law Firm, filed two Motions *in Limine* dated August 9, 2019.

Claimant's first Motion seeks a pre-hearing ruling that by failing to file an Answer and/or

Affirmative Defenses to the Demand for Arbitration, Respondent has waived all general and all

affirmative defenses in this matter.   The second Motion seeks a pre-hearing ruling by the undersigned that the Engineering Services Agreement is a binding contractual obligation between the parties that must be enforced during the Arbitration hearings.

On August 23, 2019, Respondent, FARADAY & FUTURE INC., acting through counsel, Rachel Feldman, Esq. of White & Case LLP, filed a Response in Opposition to both of Claimant's Motions supported by an Affidavit.

On August 29, 2019, Claimant filed a Reply in support of its original Motions *in Limine*.

## I.    **RULING ON MOTIONS *IN LIMINE* RE: DEFENSES.**

Claimant's initial Motion *in Limine* seeks an order from the undersigned determining that by failing to file a formal Answer and/or Affirmative Defenses to the Demand for Arbitration, Respondent has waived all defenses, both general and specific, to the Demand.  In support of the Motion, Claimant relies upon MCR 2.111(F)(2) that provides:

> "A party against whom a cause of action has been asserted by complaint, cross-claim, counterclaim or third-party claim must assert in a responsive pleading the defenses the party has against the claim and further cautions that a defense not asserted in the responsive pleading or by motion as provided by the Court Rules is waived, except for the defenses of lack of jurisdiction over the subject matter of the action, and failure to state a claim upon which relief can be granted."

In opposition to the Motion, Respondent points to Rule R-5 of the *Commercial Rules of Arbitration* for the proposition that if a party does not file an answer to the Demand, it shall be deemed a general denial.

During the initial Pre-Hearing Conference in this matter, the undersigned observed that Respondent had not filed an Answer and/or Affirmative Defenses to the Demand and affirmed that the same resulted in a general denial being lodged.  The undersigned gave Respondent the opportunity to file an Answer and/or Affirmative Defenses, which Respondent elected not to do.

By this Motion, the undersigned is called upon to reconcile an apparent conflict between MCR 2.111 and Rule R-5 of the *Commercial Rules of Arbitration*. The undersigned is resolving the apparent conflict between the two rules by holding that Commercial Rule R-5 of the AAA is superior to MCR 2.111. It is well-established that the failure to file an Answer to a Demand for Arbitration is deemed a general denial. MCR 2.111 cannot be interpreted as overriding the specific rule of commercial arbitration. By the same token, Rule R-5 of the *Commercial Rules of Arbitration* makes no mention of Affirmative Defenses being preserved by failure to respond. The undersigned is forced to conclude that while Respondent has preserved its general denial of the Demand, it has waived all affirmative defenses.

The result of this ruling is that Respondent has preserved its general denial of the Demand and waived its affirmative defenses against the Demand. Accordingly, Claimant must prove each allegation of its cause of action by a preponderance of the evidence at the hearing. That is, the essence of a general denial where the responding party simply leaves the Claimant to its proof at hearing. On the other hand, special and/or affirmative defenses that could have been raised in this matter are deemed waived pursuant to MCR 2.111.

## II.     MOTION REGARDING ENGINEERING SERVICES AGREEMENT.

In this matter, Claimant asserts that the parties entered into an Engineering Services Agreement dated June 24, 2018. Initially, this allegation was not contested by Respondent. Most recently, Respondent has asserted that the Engineering Services Agreement is not binding upon the parties because it was never executed by Respondent.

In support of its Motion, Claimant asserts that more than sufficient evidence exists in the conduct of the parties during the course in which the contract was being performed to conclude

3

that an agreement had been reached upon all of the major terms of the contractual relationship between the parties and that that agreement was the Engineering Services Agreement.

As indicated above, by failing to file specific and/or Affirmative Defenses, Respondent has waived those defenses pursuant to MCR 2.111. The allegation that a contract is not valid because of a failure of consideration and/or a failure of execution by the party against whom enforcement is sought is in fact an affirmative defense. It is too late in this action for Respondent to now raise the affirmative defense of the invalidity of the Engineering Services Agreement. Not only is this conclusion compelled based upon the waiver argument, but also based upon the documentary evidence submitted by Claimant in which the parties, through their email communications, confirmed a final agreement had been reached and that that agreement was the Engineering Services Agreement. At this point, Respondent is estopped to deny the validity of the Engineering Services Agreement and its applicability to the conduct of the parties in this action.

Based upon the foregoing, the undersigned orders that the Motion *in Limine* regarding defenses is granted in part and denied in part. The Motion is granted as to Respondent's failure to plead affirmative defenses and is denied as to the applicability of Respondent's general denial. Additionally, as to the Motion regarding the Engineering Services Agreement, the same is granted. Respondent has waived the affirmative defenses of failure of consideration or lack of a binding agreement between the parties by its failure to file Affirmative Defenses. Further, the evidence presented by Claimant and not rebutted by Respondent leads to the firm conclusion that a final agreement was reached on all terms of the Engineering Services Agreement, and the same is valid and binding upon the parties.

Dated: September 4, 2019

/s/_____
Gene J. Esshaki, Arbitrator

4842-8364-3555, v. 1

4